# INTERSTATE CIRCUIT, INC., ET AL. *v.* UNITED STATES.*

No. 269.   Argued January 11, 1939.—Decided February 13, 1939.

---

*Together with No. 270, *Paramount Pictures Distributing Co. et al.* v. *United States,* also on appeal from the District Court of the United States for the Northern District of Texas,

*Messrs. George S. Wright* and *Thomas D. Thacher,* with whom *Mr. Richard H. Demuth* was on the brief, for appellants.

212

*Solicitor General Jackson,* with whom *Assistant Attorney General Arnold* and *Mr. Charles H. Weston* were on the brief, for the United States.

MR. JUSTICE STONE delivered the opinion of the Court.

This case is here on appeal under § 2 of the Act of February 11, 1903, 32 Stat. 823, 15 U. S. C. § 29, and § 238 of the Judicial Code, as amended by the Act of February 13, 1925, 43 Stat. 936, 938, 28 U. S. C. § 345, from a final decree of the District Court for northern Texas restraining appellants from continuing in a combination and conspiracy condemned by the court as a violation of § 1 of the Sherman Anti-Trust Act, 26 Stat. 209, 15 U. S. C. § 1, and from enforcing or renewing certain contracts found by the court to have been entered into in pursuance of the conspiracy. 20 F. Supp. 868. Upon a previous appeal this Court set aside the decree and remanded the cause to the District Court for further proceedings because of its failure to state findings of fact and conclusions of law as required by Equity Rule 70½. 304 U. S. 55. The case is

now before us on findings of the District Court specifically stating that appellants did in fact agree with each other to enter into and carry out the contracts, which the court found to result in unreasonable and therefore unlawful restraints of interstate commerce.

Appellants comprise the two groups of defendants in the District Court. The members of one group of eight corporations which are distributors of motion picture films, and the Texas agents of two of them, are appellants in No. 270. The other group, corporations and individuals engaged in exhibiting motion pictures in Texas, and some of them in New Mexico, appeals in No. 269. The distributor appellants are engaged in the business of distributing in interstate commerce motion picture films, copyrights on which they own or control, for exhibition in theatres throughout the United States. They distribute about 75 per cent. of all first-class feature films exhibited in the United States. They solicit from motion picture theatre owners and managers in Texas and other states applications for licenses to exhibit films, and forward the applications, when received from such exhibitors, to their respective New York offices, where they are accepted or rejected. If the applications are accepted, the distributors ship the films from points outside the states of exhibition to their exchanges within those states, from which, pursuant to the license agreements, the films are delivered to the local theatres for exhibition. After exhibition the films are reshipped to the distributors at points outside the state.

The exhibitor group of appellants consists of Interstate Circuit, Inc., and Texas Consolidated Theatres, Inc., and Hoblitzelle and O'Donnell, who are respectively president and general manager of both and in active charge of their business operations. The two corporations are affiliated with each other and with Paramount Pictures Distributing Co., Inc., one of the distributor appellants.

Interstate operates forty-three first-run and second-run motion picture theatres, located in six Texas cities.[1] It has a complete monopoly of first-run theatres in these cities, except for one in Houston operated by one distributor's Texas agent. In most of these theatres the admission price for adults for the better seats at night is 40 cents or more. Interstate also operates several subsequent-run theatres in each of these cities, twenty-two in all, but in all but Galveston there are other subsequent-run theatres which compete with both its first- and subsequent-run theatres in those cities.

Texas Consolidated operates sixty-six theatres, some first- and some subsequent-run houses, in various cities and towns in the Rio Grande Valley and elsewhere in Texas and in New Mexico. In some of these cities there are no competing theatres, and in six leading cities there are no competing first-run theatres. It has no theatres in the six Texas cities in which Interstate operates. That Interstate and Texas Consolidated dominate the motion picture business in the cities where their theatres are located is indicated by the fact that at the time of the contracts in question Interstate and Consolidated each contributed more than 74 per cent. of all the license fees paid by the motion picture theatres in their respective territories to the distributor appellants.[2]

On July 11, 1934, following a previous communication on the subject to the eight branch managers of the dis-

[1] A first-run theatre is one in which a picture is first exhibited in any given locality. A subsequent-run theatre is one in which there is a subsequent exhibition of the same picture in the same locality.

[2] Payments of license fees by Interstate to distributor appellants in the 1934–35 season aggregated $1,077,819.58. Payments by all other exhibitors operating theatres in the same cities aggregated $369,594.72. Texas Consolidated payments for the same period aggregated $594,863.68. All other exhibitors operating in the same cities paid $47,928.22.

tributor appellants, O'Donnell, the manager of Interstate and Consolidated, sent to each of them a letter[3] on the letterhead of Interstate, each letter naming all of them as addressees, in which he asked compliance with two demands as a condition of Interstate's continued exhibition of the distributors' films in its 'A' or first-run the-

---

[3] The letter follows:

"INTERSTATE CIRCUIT, INC.,
MAJESTIC THEATRE BUILDING,
*Dallas, Texas, July 11, 1934.*

Messrs.: J. B. Dugger, Herbert MacIntyre, Sol Sachs, C. E. Hilgers, Leroy Bickel, J. B. Underwood, E. S. Olsmyth, Doak Roberts.

GENTLEMEN: On April 25th, the writer notified you that in purchasing product for the coming season 34–35, it would be necessary for all distributors to take into consideration in the sale of subsequent runs that Interstate Circuit, Inc., will not agree to purchase produce to be exhibited in its 'A' theatres at a price of 40¢ or more for night admission, unless distributors agree that in selling their product to subsequent runs, that this 'A' product will never be exhibited at any time or in any theatre at a smaller admission price than 25¢ for adults in the evening.

In addition to this price restriction, we also request that on 'A' pictures which are exhibited at a night admission price of 40¢ or more—they shall never be exhibited in conjunction with another feature picture under the so-called policy of double-features.

At this time the writer desires to again remind you of these restrictions due to the fact that there may be some delay in consummating all our feature film deals for the coming season, and it is imperative that in your negotiations that you afford us this clearance.

In the event that a distributor sees fit to sell his product to subsequent runs in violation of this request, it definitely means that we cannot negotiate for his product to be exhibited in our 'A' theatres at top admission prices.

We naturally, in purchasing subsequent runs from the distributors in certain of our cities, must necessarily eliminate double featuring and maintain the maximum 25¢ admission price, which we are willing to do.

Right at this time the writer wishes to call your attention to the Rio Grande Valley situation. We must insist that all pictures exhibited in our 'A' theatres at a maximum night admission price of

atres at a night admission of 40 cents or more.[4]   One demand was that the distributors "agree that in selling their product to subsequent runs, that this 'A' product will never be exhibited at any time or in any theatre at a smaller admission price than 25¢ for adults in the evening."   The other was that "on 'A' pictures which are exhibited at a night admission of 40¢ or more—they shall never be exhibited in conjunction with another feature picture under the so-called policy of double features." The letter added that with respect to the "Rio Grande Valley situation," with which Consolidated alone was concerned, "We must insist that all pictures exhibited in our 'A' theatres at a maximum night admission price of 35¢ must also be restricted to subsequent runs in the Valley at 25¢."

The admission price customarily charged for preferred seats at night in independently operated subsequent-run theatres in Texas at the time of these letters was less than 25 cents.   In seventeen of the eighteen independent theatres of this kind whose operations were described by witnesses the admission price was less than 25 cents. In one only was it 25 cents.   In most of them the admission was 15 cents or less.   It was also the general prac-

---

35¢ must also be restricted to subsequent runs in the Valley at 25¢. Regardless of the number of days which may intervene, we feel that in exploiting and selling the distributors' product, that subsequent runs should be restricted to at least a 25¢ admission scale.

The writer will appreciate your acknowledging your complete understanding of this letter.

Sincerely,                        (Signed)   R. J. O'DONNELL."

[4] A Class 'A' picture is a "feature picture" having five reels or more of film each approximately 1,000 feet in length, shown in theatres of the specified Texas cities charging 40 cents or more for adult admission at night. Approximately fifty per cent. of the pictures released by the distributor defendants in Texas cities in 1934–1935 were Class 'A' pictures.

tice in those theatres to provide double bills either on certain days of the week or with any feature picture which was weak in drawing power. The distributor appellants had generally provided in their license contracts for a minimum admission price of 10 or 15 cents, and three of them had included provisions restricting double-billing. But none was at any time previously subject to contractual compulsion to continue the restrictions. The trial court found that the proposed restrictions constituted an important departure from prior practice.

The local representatives of the distributors, having no authority to enter into the proposed agreements, communicated the proposal to their home offices. Conferences followed between Hoblitzelle and O'Donnell, acting for Interstate and Consolidated, and the representatives of the various distributors. In these conferences each distributor was represented by its local branch manager and by one or more superior officials from outside the state of Texas. In the course of them each distributor agreed with Interstate for the 1934–35 season to impose both the demanded restrictions upon their subsequent-run licensees in the six Texas cities served by Interstate, except Austin and Galveston. While only two of the distributors incorporated the agreement to impose the restrictions in their license contracts with Interstate, the evidence establishes, and it is not denied, that all joined in the agreement, four of them after some delay in negotiating terms other than the restrictions and not now material. These agreements for the restrictions—with the immaterial exceptions noted [5]—were carried into effect by each of the distribu-

---

[5] The Metro-Goldwyn-Mayer Distributing Corporation agreement with Interstate did not include Houston, where it operated through a subsidiary a first-run theatre, and where it did not until the 1936–1937 season license any subsequent-run pictures. It agreed with Interstate to impose the restrictions in Houston for the 1936–1937 season.

tors' imposing them on their subsequent-run licensees in the four Texas cities during the 1934–35 season. One agreement, that of Metro-Goldwyn-Mayer Distributing Corporation, was for three years. The others were renewed in the two following seasons and all were in force when the present suit was begun.

None of the distributors yielded to the demand that subsequent runs in towns in the Rio Grande Valley served by Consolidated should be restricted. One distributor, Paramount, which was affiliated with Consolidated, agreed to impose the restrictions in certain other Texas and New Mexico cities.

The trial court found that the distributor appellants agreed and conspired among themselves to take uniform action upon the proposals made by Interstate, and that they agreed and conspired with each other and with Interstate to impose the demanded restrictions upon all subsequent-run exhibitors in Dallas, Fort Worth, Houston and San Antonio; that they carried out the agreement by imposing the restrictions upon their subsquent-run licensees in those cities, causing some of them to increase their admission price to 25 cents, either generally or when restricted pictures were shown, and to abandon double-billing of all such pictures, and causing the other subsequent-run exhibitors, who were either unable or unwilling to accept the restrictions, to be deprived of any opportunity to exhibit the restricted pictures, which were the best and most popular of all new feature pictures; that the effect of the restrictions upon "low-income members of the community" patronizing the theatres of these exhibitors was to withhold from them altogether the "best entertainment furnished by the motion picture industry"; and that the restrictions operated to increase the income of the distributors and of Interstate and to deflect attendance from later-run exhibitors who yielded to the restrictions to the first-run theatres of Interstate.

The court concluded as matters of law that the agreement of the distributors with each other and those with Interstate to impose the restrictions upon subsequent-run exhibitors and the carrying of the agreements into effect, with the aid and participation of Hoblitzelle and O'Donnell, constituted a combination and conspiracy in restraint of interstate commerce in violation of the Sherman Act. It also concluded that each separate agreement between Interstate and a distributor that Interstate should subject itself to the restrictions in its subsequent-run theatres and that the distributors should impose the restrictions on all subsequent-run theatres in the Texas cities as a condition of supplying them with its feature pictures, was likewise a violation of the Act.

It accordingly enjoined the conspiracy and restrained the distributors from enforcing the restrictions in their license agreements with subsequent-run exhibitors [6] and from enforcing the contracts or any of them. This included both the contracts of Interstate with the distributors and the contract between Consolidated and Paramount, whereby the latter agreed to impose the restrictions upon subsequent-run theatres in Texas and New Mexico served by it.

Appellants assail the decree of the District Court upon three principal grounds: (a) that the finding of agreement and conspiracy among the distributor appellants to impose the restrictions upon later-run exhibitors is not supported by the court's subsidiary findings or by the evidence; (b) that the several separate contracts entered into by Interstate with the distributors are within the protection of the Copyright Act and consequently

[6] The injunction against the double feature restriction excepted from its operation two distributors, and the agent of one of them, which had previously made a practice of including such a restriction in their license agreements.

are not violations of the Sherman Act; and (c) that the restrictions do not unreasonably restrain interstate commerce within the provisions of the Sherman Act.

The Agreement Among the Distributors.

Although the films were copyrighted, appellants do not deny that the conspiracy charge is established if the distributors agreed among themselves to impose the restrictions upon subsequent-run exhibitors. *Straus* v. *American Publishers' Assn.*, 231 U. S. 222; *Paramount Famous Lasky Corp.* v. *United States*, 282 U. S. 30. As is usual in cases of alleged unlawful agreements to restrain commerce, the Government is without the aid of direct testimony that the distributors entered into any agreement with each other to impose the restrictions upon subsequent-run exhibitors. In order to establish agreement it is compelled to rely on inferences drawn from the course of conduct of the alleged conspirators.

The trial court drew the inference of agreement from the nature of the proposals made on behalf of Interstate and Consolidated; from the manner in which they were made; from the substantial unanimity of action taken upon them by the distributors; and from the fact that appellants did not call as witnesses any of the superior officials who negotiated the contracts with Interstate or any official who, in the normal course of business, would have had knowledge of the existence or non-existence of such an agreement among the distributors. This conclusion is challenged by appellants because not supported by subsidiary findings or by the evidence. We think this inference of the trial court was rightly drawn from the evidence. In the view we take of the legal effect of the coöperative action of the distributor appellants in carrying into effect the restrictions imposed upon subsequent-run theatres in the four Texas cities and of the legal effect of the separate agreements for the imposi-

tion of those restrictions entered into between Interstate and each of the distributors, it is unnecessary to discuss in great detail the evidence concerning this aspect of the case.

The O'Donnell letter named on its face as addressees the eight local representatives of the distributors, and so from the beginning each of the distributors knew that the proposals were under consideration by the others. Each was aware that all were in active competition and that without substantially unanimous action with respect to the restrictions for any given territory there was risk of a substantial loss of the business and good will of the subsequent-run and independent exhibitors, but that with it there was the prospect of increased profits. There was, therefore, strong motive for concerted action, full advantage of which was taken by Interstate and Consolidated in presenting their demands to all in a single document.

There was risk, too, that without agreement diversity of action would follow. Compliance with the proposals involved a radical departure from the previous business practices of the industry and a drastic increase in admission prices of most of the subsequent-run theatres. Acceptance of the proposals was discouraged by at least three of the distributors' local managers. Independent exhibitors met and organized a futile protest which they presented to the representatives of Interstate and Consolidated. While as a result of independent negotiations either of the two restrictions without the other could have been put into effect by any one or more of the distributors and in any one or more of the Texas cities served by Interstate, the negotiations which ensued and which in fact did result in modifications of the proposals resulted in substantially unanimous action of the distributors, both as to the terms of the restrictions and in the selection of the four cities where they were to operate.

One distributor, it is true, did not agree to impose the restrictions in Houston, but this was evidently because it did not grant licenses to any subsequent-run exhibitor in that city, where its own affiliate operated a first-run theatre.[7] The proposal was unanimously rejected as to Galveston and Austin, as was the request that the restrictions should be extended to the cities of the Rio Grande Valley served by Consolidated. We may infer that Galveston was omitted because in that city there were no subsequent-run theatres in competition with Interstate. But we are unable to find in the record any persuasive explanation, other than agreed concert of action, of the singular unanimity of action on the part of the distributors by which the proposals were carried into effect as written in four Texas cities but not in a fifth or in the Rio Grande Valley. Numerous variations in the form of the provisions in the distributors' license agreements and the fact that in later years two of them extended the restrictions into all six cities, do not weaken the significance or force of the nature of the response to the proposals made by all the distributor appellants. It taxes credulity to believe that the several distributors would, in the circumstances, have accepted and put into operation with substantial unanimity such far-reaching changes in their business methods without some understanding that all were to join, and we reject as beyond the range of probability that it was the result of mere chance.

Appellants present an elaborate argument, based on the minutiae of the evidence, that other inferences are to be drawn which explain, at least in some respects, the unanimity of action both in accepting the restrictions for some territories and rejecting them for others. It is said that the rejection of Consolidated's proposal for the

---

[7] See footnote 5.

Rio Grande Valley may have been due to the fact that the demand with respect to that territory differed materially from that directed to the six Texas cities. It is urged that the proposal for the Valley was that all pictures once shown in a first-run theatre with a 35 cents admission should not thereafter be exhibited in any city in the Valley for less than 25 cents admission, while the demand in behalf of Interstate with respect to the six Texas cities was that 'A' pictures, after a first-run in theatres charging 40 cents admission or more, should not thereafter be exhibited in the same city for less than 25 cents admission. But reference to the O'Donnell letter shows that both demands related to pictures shown in a first-run or 'A' theatre and were not in terms limited to subsequent-run exhibitions in the same city in which the first run had occurred. The record discloses no reason for the distinction taken between first-run theatres in the six cities charging an admission of 40 cents or more and those in the Valley served by Consolidated charging 35 cents, other than the fact that the cities there were smaller.

The trial court, interpreting the letter in the light of the whole evidence, which showed unmistakably that one purpose of both demands was to protect first-run houses from competition of subsequent-run houses, concluded that the substance of the proposals in one case as in the other was that the restrictions upon the subsequent-run theatres were to be imposed only in the same city in which the first run had occurred. We agree with its conclusion, but in any event since the demand made by Interstate was phrased as broadly as that made by Texas Consolidated, both as to the kind of pictures affected and the scope of the restriction, we can find no basis for saying that one was more limited in its essentials than the other, or that any explanation is thus afforded of the unanimous acceptance of the demands of Interstate in

four of the six cities affected by the proposal, and the unanimous rejection of the demand of Consolidated. In the face of this action and similar unanimity with respect to other features of the proposals, and the strong motive for such unanimity of action, we decline to speculate whether there may have been other and more legitimate reasons for such action not disclosed by the record, but which, if they existed, were known to appellants.

The failure of the distributors to make any substantial changes in their business practices in dealing with exhibitors in Austin for the season 1934–35; their failure to unite in imposing the restriction as to admission prices in subsequent-run theatres in that city; and their failure to enter into the proposed restrictive agreement with Interstate for Austin, are likewise unexplained by any inferences to be drawn from the record. The facts that three of the distributors continued their established practice there, as elsewhere, of placing restrictions against double-billing in their license contracts; that the 25 cents admission restriction appeared in the Austin license agreements of one distributor for that year; and that certain of the distributors included the restrictions in their Austin license agreements in later years, do not militate against this conclusion. Taken together, the circumstances of the case which we have mentioned, when uncontradicted and with no more explanation than the record affords, justify the inference that the distributors acted in concert and in common agreement in imposing the restrictions upon their licensees in the four Texas cities.

This inference was supported and strengthened when the distributors, with like unanimity, failed to tender the testimony, at their command, of any officer or agent of a distributor who knew, or was in a position to know, whether in fact an agreement had been reached among them for concerted action. When the proof supported, as we think it did, the inference of such concert, the

burden rested on appellants of going forward with the evidence to explain away or contradict it. They undertook to carry that burden by calling upon local managers of the distributors to testify that they had acted independently of the other distributors, and that they did not have conferences with or reach agreements with the other distributors or their representatives. The failure under the circumstances to call as witnesses those officers who did have authority to act for the distributors and who were in a position to know whether they had acted in pursuance of agreement is itself persuasive that their testimony, if given, would have been unfavorable to appellants. The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. *Clifton* v. *United States,* 4 How. 242, 247. Silence then becomes evidence of the most convincing character. *Runkle* v. *Burnham,* 153 U. S. 216, 225; *Kirby* v. *Tallmadge,* 160 U. S. 379, 383; *Bilokumsky* v. *Tod,* 263 U. S. 149, 153, 154; *Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, 111, 112; *Mammoth Oil Co.* v. *United States,* 275 U. S. 13, 52; *Local 167* v. *United States,* 291 U. S. 293, 298.

While the District Court's finding of an agreement of the distributors among themselves is supported by the evidence, we think that in the circumstances of this case such agreement for the imposition of the restrictions upon subsequent-run exhibitors was not a prerequisite to an unlawful conspiracy. It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that the others were asked to participate; each knew that coöperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint of commerce, which, we will presently point out, was unreasonable within the meaning of the Sher-

man Act, and knowing it, all participated in the plan. The evidence is persuasive that each distributor early became aware that the others had joined. With that knowledge they renewed the arrangement and carried it into effect for the two successive years.

It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. *Schenck* v. *United States,* 253 F. 212, 213, aff'd, 249 U. S. 47; *Levey* v. *United States,* 92 F. 2d 688, 691. Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act. *Eastern States Lumber Assn.* v. *United States,* 234 U. S. 600; *Lawlor* v. *Loewe,* 235 U. S. 522, 534; *American Column Co.* v. *United States,* 257 U. S. 377; *United States* v. *American Linseed Oil Co.,* 262 U. S. 371.

The Protection Afforded by the Copyright Act to the Contracts between Interstate and the Distributors.

The decree below enjoined enforcement and renewal of the separate agreements between each distributor and Interstate and of the contract between Paramount and Consolidated imposing the restrictions upon later-run theatres in certain cities in Texas and New Mexico, although the court found no conspiracy among the distributors to effect this latter restriction. Appellants assail this part of the decree on the ground that such separate agreements, if entered into without agreement or concert among the distributors, are a legitimate exercise of the monopoly secured to the distributors by their copyrights.

Under § 1 of the Copyright Act, 35 Stat. 1075, 17 U. S. C. § 1, the owners of the copyright of a motion picture film acquire the right to exhibit the picture and to grant an exclusive or restrictive license to others to exhibit it.

See *Manners* v. *Morosco*, 252 U. S. 317. Appellants argue that the distributors were free to license the films for exhibition subject to the restrictions, just as a patentee in a license to manufacture and sell the patented article may fix the price at which the licensee may sell it. *Bement* v. *National Harrow Co.*, 186 U. S. 70; *United States* v. *General Electric Co.*, 272 U. S. 476. That the parallel is not complete is obvious. Because a patentee has power to control the price at which his licensee may sell the patented article, it does not follow that the owner of a copyright can dictate that other pictures may not be shown with the licensed film or the admission price which shall be paid for an entertainment which includes features other than the particular picture licensed. Cf. *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502; *Carbice Corporation* v. *American Patents Development Corp.*, 283 U. S. 27; *Leitch Manufacturing Co.* v. *Barber Co.*, 302 U. S. 458.

We have no occasion now to pass upon these or related questions. Granted that each distributor, in the protection of his own copyright monopoly, was free to impose the present restrictions upon his licensees, we are nevertheless of the opinion that they were not free to use their copyrights as implements for restraining commerce in order to protect Interstate's motion picture theatre monopoly by suppressing competition with it. The restrictions imposed upon Interstate's competitors did not have their origin in the voluntary act of the distributors or any of them. They gave effect to the will and were subject to the control of Interstate, not by virtue of any copyright of Interstate, for it had none, but through its contract with each distributor. Interstate was able to acquire the control and impose its will by force of its monopoly of first-run theatres in the principal cities of Texas and the threat to use its monopoly position against copyright owners who did not yield to its demands. The purpose

and ultimate effect of each of its contracts with the distributors was to restrain its competitors in the theatre business by forcing an increase in their admission price and compelling them through the double feature restriction to make their entertainment less attractive, and to preclude the distributors for the specified time from relaxing the pressure of the restrictions upon them.

The case is not one of the mere restriction of competition between the first showing of a copyrighted film by Interstate and a subsequent showing of the same film by a licensee of the copyright owner. The contract, when applied to the situation existing in the four Texas cities, had a more extensive effect. Both Interstate's first-run and second-run theatres in each of the cities regularly compete with the independent second-run theatres in those cities. Since all are in practically continuous operation during the season, competition between them extends to the exhibition of films furnished by different distributors including those of copyright owners shown by independents, which compete with those of other copyright owners shown at the same time by Interstate. Moreover, the provision in Interstate's contracts for the restriction against double billing stipulated for restraint upon competition with Interstate in the exhibition of films in the double bill in which neither Interstate nor the licensor had any interest by way of copyright or otherwise. The patent effect of the contract was to impose an undue restraint both as to admission price and the character of the exhibition upon competing theatre businesses habitually exhibiting the competitive pictures of different copyright owners. Through acceptance of its terms by the principal distributors the contract became the ready instrument by which Interstate succeeded in dominating the business of its competitors in the Texas cities. The fact that the restrictions may have been of a kind which a distributor could voluntarily have imposed, but

did not, does not alter the character of the contract as a calculated restraint upon the distribution and use of copyrighted films moving in interstate commerce. Even if it be assumed that the benefit to the distributor from the restrictions is one which it might have secured through its monopoly control of the copyright alone, that would not extend the protection of the copyright to the contract with Interstate and to the resulting restraint upon the competition of its business rivals.

A contract between a copyright owner and one who has no copyright, restraining the competitive distribution of the copyrighted articles in the open market in order to protect the latter from the competition, can no more be valid than a like agreement between two copyright owners or patentees. *Straus v. American Publishers' Assn., supra; Paramount Famous Lasky Corp. v. United States, supra;* see *Standard Oil Co. v. United States,* 283 U. S. 163, 174. In either case if the contract is effective, as it was here, competition is suppressed and the possibility of its resumption precluded by force of the contract. An agreement illegal because it suppresses competition is not any less so because the competitive article is copyrighted. The fact that the restraint is made easier or more effective by making the copyright subservient to the contract does not relieve it of illegality. *Standard Sanitary Mfg. Co. v. United States,* 226 U. S. 20.

Unreasonableness of the Restraint.

The restrictions imposed on the subsequent-run exhibitors were harsh and arbitrary. As we have seen, they were forced upon the distributors and upon their customers as a result of the agreements entered into by Interstate with the distributors. Compliance with the restrictions were a uniform condition of exhibition of the films by subsequent-run theatres. There were wide differences in the location and character of the subsequent-

run houses in the four Texas cities, which afforded basis
for the corresponding differences in admission prices
charged before the restrictions were adopted. Due to the
practice of the distributors of establishing clearance pe-
riods between the first and each successive run, later runs
are progressively less attractive. The poorer class of
theatres, exhibiting the later runs, sometimes offered a
double bill as an offsetting inducement for patronage.
Despite these differences which normally affect the admis-
sion price that could be charged by subsequent-run the-
atres, the 25 cents admission price was to be required of
all alike, forcing increases in admission price ranging from
25 per cent. to 150 per cent.

The trial court found that practically all of the later-
run exhibitors who bowed to the restrictions would not
have done so but for the compulsion of their need of
showing the restricted pictures, and that the result was
to increase the income of the distributors and Interstate
and diminish that of the exhibitors who accepted the re-
strictions, by deflecting attendance from subsequent-run
theatres to Interstate's first-run theatres. There was no
testimony that such loss was offset by the higher ad-
mission price of the second-run theatres, and there was
evidence that some of the poorer class of second-run
theatres suffered loss of income by yielding to the re-
strictions. Some who did not yield were compelled to
forego exhibition of the distributors' feature pictures. The
effect was a drastic suppression of competition and an
oppressive price maintenance, of benefit to Interstate and
the distributors but injurious alike to Interstate's subse-
quent-run competitors and to the public.

The benefit, at such a cost, does not justify the restraint.
*Eastern States Lumber Assn.* v. *United States, supra,*
613; *Duplex Co.* v. *Deering,* 254 U. S. 443, 468; *Anderson*
v. *Shipowners Association,* 272 U. S. 359, 363; *Bedford
Cut Stone Co.* v. *Stone Cutters' Assn.,* 274 U. S. 37, 47.

It does not appear that the competition at which they were aimed was unfair or abnormal. Cf. *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, 363, 372. The consequence of the price restriction, though more oppressive, is comparable with the effect of resale price maintenance agreements, which have been held to be unreasonable restraints in violation of the Sherman Act. *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373; *United States* v. *Schrader's Son, Inc.,* 252 U. S. 85. Cf. *United States* v. *Trenton Potteries Co.,* 273 U. S. 392, 397, *et seq.*

We think the conclusion is unavoidable that the conspiracy and each contract between Interstate and the distributors by which those consequences were effected are violations of the Sherman Act and that the District Court rightly enjoined enforcement and renewal of these agreements, as well as of the conspiracy among the distributors.

*Affirmed.*

MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.

MR. JUSTICE ROBERTS, dissenting.

I think the decree should be reversed. The bill charges that the two exhibitor defendants which were under the same management, knowing that subsequent run houses in Dallas, Houston, San Antonio, Fort Worth, Austin, and Galveston, the largest cities in Texas, and in Waco, Wichita Falls, Tyler, Amarillo, Texas, and Albuquerque, New Mexico, could not operate without the showing of feature films, in order to strengthen these two defendants' monopoly in first run exhibition of such feature films, and to monopolize the business of exhibiting feature films in second or subsequent run houses operated by them in those cities, conspired to notify the distributor defendants that, during the 1934-1935 season, and subsequent seasons, the latter must advise second and subsequent run

exhibitors that such feature films could not be operated in second or subsequent run houses for less than twenty-five cents adult lower floor admission or as part of a double feature program and that, unless the distributor defendants would do so, the exhibitors would not maintain a night adult admission price of forty cents or more for the first run exhibitions of feature films licensed by the distributor defendants to them. The bill charged that, upon receipt of advices to this effect from the exhibitor defendants, the distributor defendants joined in the unlawful combination and conspired with the exhibitor defendants to place such restrictions in licenses to second or subsequent run exhibitors.

The parties entered into a stipulation of facts, in lieu of evidence, binding upon them for the purposes of suit, and further agreed that any party might introduce additional relevant and material evidence bearing upon the issues "but not inconsistent with any fact contained in" the stipulation. Plaintiff and defendants introduced additional evidence. The testimony of second or subsequent exhibitors called as witnesses by plaintiff and defendants may be said to have been, in some respects, conflicting. The evidence offered by the plaintiff and the defendants with respect to the negotiations between the exhibitor defendants and the distributor defendants, and the conduct of the latter, was uncontradicted upon all points material to a resolution of the fact issues in the cause.

The District Court made ten findings (numbered from 12 to 21, inclusive) of subsidiary or evidentiary facts and based upon these specific findings one conclusion of ultimate fact,—that the distributor defendants conspired amongst themselves to take uniform action upon the proposals of Interstate and conspired with each other and with Interstate to impose the restrictions requested by Interstate upon all subsequent run exhibitors in Dallas, Fort Worth, Houston, and San Antonio.

The appellants contend, and I think their contention is sound, that the subsidiary findings are insufficient to support the fact conclusion and that these subsidiary findings are, in a number of vital instances, contrary to, or unsupported by, the agreed statement of facts and, in other instances, are in the teeth of uncontradicted and unimpeached testimony.

Since this is a direct appeal from the District Court in an equity suit, and the findings are challenged, this court is bound to review them and to determine whether they have a proper basis in the evidence. I think such a review demonstrates the lack of support of the critical basic findings. No good purpose would be served by a detailed analysis of what I consider erroneous and unsupported findings. But I am of opinion that the findings ought not to stand and that the conclusion that there was a conspiracy, either between the distributor defendants or between them and the Interstate corporation, is unjustified. The opinion of this Court accepts and closely follows these findings of fact but, while approving the conclusion of the District Court, finds it unnecessary to give detailed consideration to the appellants' challenge of the accuracy and sufficiency of the subsidiary findings, for the reason that it holds, as matter of law, on uncontradicted facts, that there were eight separate conspiracies unreasonably to restrain trade in interstate commerce in virtue of the agreement of each of the distributor defendants with Interstate to impose restrictions on subsequent run exhibitors in certain cities.

Separately considered, I think these agreements are not conspiracies contemplated by the Sherman Act and the holding that they are goes far beyond anything this Court has ever decided. The distributor defendants are owners of copyrights on moving picture films. The copyright law gives them the exclusive privilege of licensing performances of the photoplays recorded. On the other

hand, there are competing concerns whose copyrighted feature films are licensed for the purpose of production. In addition, there are copyrighted films of lower classes well known to the trade. These lower class films are usually licensed to houses that charge lower prices for first run exhibition than those charged by theatres showing feature films, and both the feature films, second and subsequent run, and other films of less attraction and less expensively produced, are exhibited by so-called second run houses. The latter pay a much reduced rate to obtain the feature films for exhibition in the same city after their original showing as feature films in first run houses. Many of the subsequent run houses charge low admission prices, and sometimes put on double bills.

Interstate is the largest licensee of first run feature films in Texas. It has many more first run houses than any other Texas exhibitor. Its first run houses are in the largest cities where the highest admission prices can be obtained. The distributors are, of course, interested in the conservation and protection of the necessarily high license fees which they must obtain for first runs of feature pictures. These are far higher than those received for the second showings of the same pictures in the same city. They naturally have to protect themselves and their licensees from the destruction of the good will and drawing power of these feature films in their first runs. In an effort to accomplish this, by requiring minimum admission charges and prohibiting double billing in subsequent runs of feature pictures, they may, of course, narrow the opportunity of second run houses to obtain feature pictures.

I agree that while the Copyright Act gives a distributor a so-called monopoly, that monopoly cannot be made the cover for a conspiracy to restrain trade or commerce.[1]

---

[1] *Straus* v. *American Publishers' Assn.*, 231 U. S. 222; *Paramount Famous Corp.* v. *United States*, 282 U. S. 30.

But I think it obscures the issue to use the phrase "monopoly." What the copyright gives is much the same as what is conferred by the patent law.[2] The exhibition of a photoplay, were it not for the copyright law, would amount to a public disclosure and the use of the material would thereafter be open to the public. All the Copyright Act does is to create a form of property in the literary or artistic production of the author or artist. The Act attaches to the product of his brain certain attributes of property. One of these is the right of exclusive use similar to that attaching to physical property; another is the right to sell the production with consequent exclusive enjoyment in the vendee; another is the right to license others to use the product as one might lease or bail real or personal property. The monopoly, so called, amounts to no more than the attachment to the work of an author or composer or producer of motion pictures of the same rights as inhere in other property under the common law. Therefore, the standing of the distributor defendants toward their customers, as respects the productions proposed to be licensed, differs in no way from that of the owner of any other property toward those to whom he leases or licenses its use or sale.

The decision of the court necessarily means that the owner of a product may not agree with an important customer that the former will not sell the product at a cut rate to the latter's competitors in the same city in which he conducts his business. The decision leads to the necessary conclusion that a manufacturer whose skill results in the production of apparatus of superior quality may not, in consideration of a price to be paid him for the bailment of that apparatus to certain users in a city, contract, as an inducement to the users, that he will not bail the same apparatus at lower and destruc-

---

[2] See *United States* v. *Dubilier Condenser Corp.*, 289 U. S. 178, 186.

tive prices to his bailees' competitors in the same city. I think it has never been suggested that an agreement of the sort mentioned, restricted in time and place, amounts to a conspiracy in unreasonable restraint of trade or commerce. The right to make such agreements is essential to the realization of the full value of the property. It is conceded that the distributor defendants might grant exclusive licenses to Interstate, and that an exclusive license to Interstate would not constitute a conspiracy under the Sherman Act, or confer any cause of action on others who desired licenses in the same city; and this remains true however much such action by the licensor might injure the business of others seeking licenses.

I am of opinion that the restrictions in the licenses of second run exhibitors were not unreasonable restraints of commerce under the Sherman Act. There is no contention that the action of the distributor defendants discouraged competition between them either for the business of Interstate or for that of subsequent run licensees. The restrictions upon the latter were not intended to increase license fees paid by them or those paid by Interstate; they were imposed to prevent destruction of the good will which made possible the continued exhibition of first run feature pictures and to avoid decrease of the revenue from those pictures then and theretofore enjoyed under licenses to Interstate and other first run feature exhibitors. The reasonableness of the restrictions must be judged by the situation of the industry and the propriety of its protection from practices which would seriously injure it.[3] The question always is whether an agreement unduly restrains competition and, in applying

[3] *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, 358, 359, 360, 362. Compare *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238.

this test, consideration must be given both to the intent and effect of the agreement in the light of realities.

It is settled that the proprietor of a copyright may grant an exclusive license; that is, may covenant with his licensee that he will not license anyone else, as the owner of a patent may grant a similar exclusive license to make or sell the patented article.[4] It is settled that the distributor defendants could lawfully stipulate with their licensees, whether first run or subsequent run, as to the admission price to be paid by patrons and that, so to do, would not be a violation of the Sherman Act.[5] But it is said that if, in order to protect its earnings from first run licenses by enabling its licensees to pay the demanded consideration, the distributor agrees to restrict in anywise the exhibition of the same feature by a subsequent run exhibitor he has violated the Anti-Trust Law. In the nature of things this cannot be true. The record discloses that the distributors have always provided a so-called "clearance" between the first run and subsequent runs of feature pictures. By this is meant that the distributors refuse to license a subsequent run theatre to show such a feature until the expiration of a given number of days or months after the picture has been shown in a first run house. This is a perfectly natural procedure and one obviously required to protect the value of the first run license. Under the decision here, however, if a distributor should agree with a first run house that if it will contract for a given feature picture at a given price the distributor will impose a clearance on second run houses this would be a conspiracy in restraint of trade. Other restrictions tending to preserve the value of the

---

[4] *Manners* v. *Morosco*, 252 U. S. 317; *Bement* v. *National Harrow Co.*, 186 U. S. 70.

[5] *United States* v. *General Electric Co.*, 272 U. S. 476, 488–490; *Standard Oil Co.* v. *United States*, 283 U. S. 163, 179.

first exhibition of a feature picture such as those challenged in this case are just as necessary and, I suppose, in the absence of agreement would be held just as lawful as the restriction known as a clearance.

The opinion of the Court recognizes that a distributor may lawfully agree that its exhibitor licensee shall have the exclusive right to exhibit a copyrighted play but condemns the agreements here in controversy although a much less drastic restraint respecting licenses to subsequent run exhibitors results from the provision for licenses with a restriction as to price and as to double billing.

Once the property rights conferred by the Copyright Law are recognized it must follow that the principles governing the right to use, sell, or turn to account other forms of property are equally applicable here. We have often held that a contract containing a covenant in restraint of trade is valid if the restraint is reasonably necessary for the protection of the right granted by the owner of the property. Examples of such lawful contracts are those by which the vendor of a business sold as a going concern agrees that for the protection of its value he will for a period of years refrain from engaging in the same business in a prescribed territory; [6] and those by the vendor with the vendee of an article to be used in business or trade that it shall not be used so as to interfere with the vendor's business; [7] which are held not to offend the Sherman Act if the prohibition has a reasonable relation to the value of the business of the vendor.

---

[6] *Cincinnati Packet Co.* v. *Bay*, 200 U. S. 179; *Oregon Steam Navigation Co.* v. *Winsor*, 20 Wall. 64, 67.

[7] *Fowle* v. *Park*, 131 U. S. 88; *Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236, 250, 252; *Moore* v. *New York Cotton Exchange*, 270 U. S. 593; *United States* v. *General Electric Co.*, 272 U. S. 476; *United States* v. *Addyston Steel Co.*, 85 F. 271.

The Government stresses the fact that each of the distributors must have acted with knowledge that some or all of the others would grant or had granted Interstate's demand. But such knowledge was merely notice to each of them that if it was successfully to compete for the first run business in important Texas cities it must meet the terms of competing distributors or lose the business of Interstate. It could compete successfully only by granting exclusive licenses to Interstate and injuring subsequent run houses by refusing them licenses,—a course clearly lawful,—or by doing the less drastic thing of agreeing to protect the good will of its pictures by putting necessary and, not severely burdensome restrictions upon subsequent run exhibitors, which I think equally lawful.

MR. JUSTICE McREYNOLDS and MR. JUSTICE BUTLER join in this opinion.