### McGUNNIGAL et al. v. UNITED STATES.
### No. 4040.

Circuit Court of Appeals, First Circuit.
Sept. 17, 1945.

Writ of Certiorari Denied Dec. 10, 1945.
See 66 S.Ct. 267.

---

[5] In hot boiler or fire rooms.

[6] Emphasis added.

Hubert C. Thompson and Alfred Sigel, both of Boston, Mass., for appellants.

Joseph M. Hargedon, Asst. U. S. Atty., of Boston, Mass., James W. Knapp, Atty., Department of Justice, of Washington, D. C., and James E. Agnew, Sp. Asst. to U. S. Atty., of Boston, Mass. (Edmund J. Brandon, U. S. Atty., of Boston, Mass., of counsel), for appellee.

Before MAHONEY and WOODBURY, Circuit Judges, and HEALEY, District Judge.

WOODBURY, Circuit Judge.

This is a consolidated appeal from judgments of the District Court of the United States for the District of Massachusetts sentencing the defendant-appellants (eight in number) to terms of imprisonment after a jury had found them guilty as charged in an indictment alleging that they with sixteen others had conspired to defraud the United States. Specifically the indictment charged the defendants under 18 U.S.C.A. § 88 with conspiring to violate the so-called "False Claims Statute." 18 U.S.C.A. § 80. The relevant parts of the statutes are quoted in the margin.[1]

There is no dispute that at various times during the period alleged in the indictment —January 1, 1943, to May 31, 1944—the appellants and their co-defendants were employed by the Bethlehem-Hingham Shipyard, Inc., a private corporation, which during that interval was exclusively engaged at Hingham, Massachusetts, in constructing vessels of war. The appellant, McGunnigal, and the defendant Bodenschatz who testified for the Government and whose case is not before us, were employed in the yard as "counters"; the other appellants and the fifteen other defendants

---

[1] 18 U.S.C.A. § 88. "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

18 U.S.C.A. § 80. "Whoever shall make or cause to be made or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, or any department thereof, * * any claim upon or against the Government of the United States, or any department

or officer thereof, * * * knowing such claim to be false, fictitious, or fraudulent; or whoever shall knowingly and willfully falsify or conceal or cover up by any trick scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, * * * knowing the same to contain any fraudulent or fictitious statement or entry in any matter within the jurisdiction of any department or agency of the United States * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

as welders. All defendants at one time or another worked on one or two of three escort vessels designated in the yard by hull numbers 3080, 3081, and 3097, which were being built for the United States Government under contracts of the familiar "cost plus" type.

The welders were paid by the hour with time and a half for overtime and double time for Sundays. In addition they were paid under the shipyard's work incentive plan for "bonus hours" which were described as one half the time saved by a welder by reason of his accomplishing more work in a given time than was called for by certain work schedules established by the shipyard for various kinds of welding.

The "counters" were employed to appraise the type of welding done by the welders, to measure its amount, and to make a record thereof on "daily piece work tally sheets". These sheets were signed by the welder, his counter, and the welding supervisor, and then were turned in to the shipyard's office where they were used to compute the welders' "bonus hours" and hence their pay. Thereafter the information on the tally sheets was used to calculate the labor cost of the vessels involved and thus to determine in part the payments due from the government to the yard under the "cost plus" contracts.

In the indictment it is alleged that the defendant welders conspired and agreed with the defendant counters that the latter, in return for money paid to them by the welders, would enter on the daily tally sheets amounts of welding in excess of that actually performed. Then it is alleged that: "It was the plan and purpose of said conspiracy that by reason of the aforesaid false statements and entries in said daily tally sheets * * * the defendant welders would each be given credit for bonus hours of work to which they were not truly entitled and that they would be paid each payroll period by said Shipyard for the said false and fraudulent bonus hours, with which they had been credited during the payroll period." Then follows the allegation that: "At all times mentioned herein the defendants well knew that the said Shipyard would be reimbursed by the Navy Department for the cost of work done in connection with the manufacture and construction of the aforesaid ships, and that the ex-cess and fraudulent amounts of payroll payments which they would receive each payroll period would be charged and billed to the said Navy Department by the Shipyard and that said Navy Department would pay and reimburse the Shipyard for said false, fraudulent and excess payroll payments out of the funds of the United States of America."

The indictment concludes with allegations of appropriate overt acts.[2]

All the appellants concede, as they must, that there is credible evidence of an agreement between the "counters" and the welders here involved whereby the former, in return for payments of money, would give the latter credit for work they had not performed. But the appellants argue that their motions for a directed verdict should have been granted for variance between the indictment and the proof, and for lack of evidence to support the indictment. Furthermore they contend that they should have a new trial because of prejudicial errors committed by the court below in admitting certain evidence.

The appellants' contention that a variance exists is based upon the proposition that the indictment alleges a single general conspiracy whereas the evidence shows several smaller ones.

Whether there was one general conspiracy, as the Government contends, or whether there were many separate ones— one between each individual welder involved and his counter, or at least one between the welders on each of the three hulls and their counter or counters—as the appellants contend, is a question of fact which the jury under explicit instructions that they should acquit unless they found but one conspiracy, has answered in the Government's favor. The question for us is whether there is any evidence to support this conclusion. We think that there is.

From the evidence it could reasonably be found that the counters operated what were, obviously loosely, described as "clubs" on the hulls upon which they worked; that by a "club" was meant an arrangement whereby the welders would pay sums of money, usually $5.00 but in two instances $2.50, weekly, to one or the other of the counters in return for which the counters would give the welder more "bonus hours" than he was entitled to, and that

2 The defendant-appellants do not question either the sufficiency of these allega-tions or the sufficiency of the evidence offered to support them.

each pay day "club" members paid one or the other of the counters and whichever counter collected would divide with his fellow. Clearly this shows a conspiracy to defraud between the counters and separate individual welders. Whether or not it shows a conspiracy to defraud the United States rather than the Shipyard we shall consider hereafter. And we think it shows also a single general conspiracy, not just a number of separate and distinct smaller ones. It is hardly reasonable to suppose that each welder did not know that others had a similar arrangement with one or both of the counters. The term "club" having been commonly used to describe the arrangement, all who joined must have known that a group had been formed for the purpose of fraud. There was thus a community of interest and concerted action to advance that interest and this is enough. To paraphrase the language of the Supreme Court in Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610, it is enough that, knowing that concerted action was contemplated and invited, the defendants gave their adherence to the fraudulent scheme and participated in it. That the welders did not know all their fellow participants or did not all participate at the same time is unimportant. "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." 306 U.S. at page 227, 59 S.Ct. at page 474, 83 L.Ed. 610.

Furthermore the broad rule adopted in some circuits that a fatal variance exists whenever a single conspiracy is charged in an indictment and the effect of the proof offered in support of it is to split the conspiracy into several, has been limited, Berger v. United States, 295 U.S. 78, 81, 55 S.Ct. 629, 630, 79 L.Ed. 1314, in which the Supreme Court said that the view " 'Where one large conspiracy is charged, proof of different and disconnected smaller ones will not sustain a conviction.' * * * ignores the question of materiality[3]; and should be so qualified as to make the result of the variance depend upon whether it has substantially injured the defendant." Then later in the same case, 295 U.S. at page 83, 55 S.Ct. at page 631, 79 L.Ed. 1314, the court elaborated what it meant by substantial injury to a defendant when it said: "In Washington & G. R. Co. v. Hickey, 166 U.S. 521, 531, 17 S.Ct. 661, 665, 41 L.Ed. 1101, this court said that 'no variance ought ever to be regarded as material where the allegation and proof substantially correspond, or where the variance was not of a character which could have misled the defendant at the trial.' This was said in a civil case, it is true, but it applies equally to a criminal case if there be added the further requisite that the variance be not such as to deprive the accused of his right to be protected against another prosecution for the same offense." It will suffice for us to say without laboring the point further that on the basis of the Berger case we would feel constrained to hold the variance immaterial even if we found no evidence from which a single conspiracy could be found.

Now the question arises whether there is any evidence to support a finding of a conspiracy to defraud the United States rather than the Shipyard. The appellants contend that there is no evidence that they knew that the Government would eventually pay the padded payrolls and thus that there is evidence only of a conspiracy to defraud the Shipyard, and this they say is not enough to support the indictment which alleges a conspiracy to defraud the United States. The Government on the other hand takes the position that a conspiracy to defraud someone having been shown, it is enough to sustain a conviction under the indictment if there is proof that eventually the United States would be the victim of the fraud.

We do not consider it necessary to choose one of these positions or the other because the court below charged in accordance with the appellants' contention and we find evidence in the record to support that charge. That is, we find evidence from which the jury could properly infer that the appellants knew that the fictitious labor charges would be reflected in higher costs to the Government and thus that the Government would ultimately be the victim of their fraud. See United States v. Wal-

---

[3] See § 269 of the Judicial Code, 28 U.S. C.A. § 391, which provides in part: "On the hearing of any appeal, certiorari, * * or motion for a new trial, in any case, civil or criminal, the court shall give judg-ment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

ter, 263 U.S. 15, 18, 44 S.Ct. 10, 68 L.Ed. 137.

To be sure the appellants, all of whom took the stand, professed ignorance of the fact that the ships upon which they had worked were being built under "cost plus" contracts. But this does not save them as a matter of law. Escape is not that easy. A finding of a defendant's knowledge of the existence of a material matter of fact, or his lack of it, must of necessity in many instances rest upon inferences rather than direct evidence. And we find here evidence from which the jury could legitimately infer that the appellants knew more than they were willing to admit.

They knew that the ships upon which they had worked were ships of war, they knew that those ships were being built for the United States, or an ally under lend lease, and all but one admitted knowledge that the United States would eventually pay for them. Knowing this much, and it being well known generally that the "cost plus" type of contract was widely used by the Government during the late war, we think it might logically be inferred that the appellants in fact knew, or at least had reason strongly to suspect, that the payrolls which they conspired to pad would ultimately be paid by the United States Government. Thus we find support in the record for the parts of the charge copied in the margin.[4]

■ The appellants complain of the admission in evidence of the contracts between the Shipyard and the United States under which the hulls in question were built, and also of the admission in evidence of certain of the Shipyard's bookkeeping records and vouchers. Their objection is on the ground of lack of evidence that they had any knowledge of the contents, or even of the existence, of those documents. The objection is not well taken. It was obviously an essential part of the Government's case to show that eventually it would pay the entire labor cost of the ships and that is what the documents in question clearly show. The appellants' rights were adequately protected by the charge. See footnote 4, supra.

Their other objections to the admission of evidence do not merit discussion. It

---

[4] "The burden is upon the Government to prove beyond a reasonable doubt that the defendants had knowledge that the shipyard would present to the United States Government a claim for reimbursement for money paid to the defendants. The burden is on the Government to prove beyond a reasonable doubt that the defendants conspired and agreed to defraud the United States of America.

"I want to point out that in order to find the defendants guilty, if you reach a conclusion that they entered into a plan to cause false claims to be made, you must find that the plan was to cause them to be presented against or to the United States,—in other words, that the claims were to be presented with knowledge that the United States would sooner or later pay them in whole or in part.

"Now, while it is the duty of the Government to prove every material allegation contained in the indictment and to prove knowledge on the part of these defendants, that duty can be fulfilled by circumstantial evidence just as well as by direct evidence. In other words, it is not necessary for the Government to prove that each defendant had specific knowledge that the claim was being presented to the Government. It is enough if they show you facts, circumstances, and conditions from which you would infer or imply that they had such knowledge.

"In that respect you may consider, of course, in the light of the evidence that has been submitted here, first, the type of contract that Bethlehem had with the Government. Was it a private contract hidden away so that no one ever saw it, or was it a public contract to which all parties had access? I do not mean by that that you would expect these defendants to go up and look at the contract but it is an open contract. It may well be that there is general knowledge as to just how the Government has these ships built. On the other hand, if it is a private contract closely guarded so that no one but the Bethlehem and the Government ever saw it, then of course that suggestion of public knowledge could not be entertained.

"On that score you will consider the condition of these men, the employment of these men and the circumstances under which they are employed and how their tally sheets which have been brought here show where they went and so forth; and from all of the circumstances, including the statements that have been made, if you believe that they were made, those circumstances might justify you in believing that the Government has established the burden that they knew that these claims would eventually be presented to the United States Government and that their presentation might result in the Government being defrauded."

suffices to say that upon consideration we find no substance in them.

The judgments of the District Court are affirmed.