**CHICAGO PROFESSIONAL SPORTS LIMITED PARTNERSHIP and WGN Continental Broadcasting Company, Plaintiffs,**

v.

**NATIONAL BASKETBALL ASSOCIATION, Defendant.**

No. 90 C 6247.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 6, 1995.

Joel G. Chefitz, Stephen D. Libowsky, James E. Hanlon, Jr., Ronald S. Betman, Laura Keidan Martin, and Robert K. Niewijk, Katten, Muchin & Zavis, Chicago, IL, for Chicago Professional Sports Ltd. Partnership.

John D. McCambridge, Irving C. Faber, Darrell J. Graham, Eric D. Brandfonbrener, Christopher B. Wilson, and Michael P. Conway, Grippo & Elden, Chicago, IL, for WGN.

Matthew A. Rooney, Mayer, Brown & Platt, Chicago, IL, Michael A. Cardozo, Ronald S. Rauchberg, Howard L. Ganz, Gregg M. Mashberg, Bradley I. Ruskin, Proskauer, Rose, Goetz & Mendelsohn; and Jeffrey A. Mishkin and William S. Koenig, National Basketball Ass'n, New York City, for National Basketball Ass'n.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

WILL, District Judge.

In January 1991, we enjoined the National Basketball Association ("NBA") from reducing to 20 from 25 the number of games involving the Chicago Professional Sports Limited Partnership's NBA team, the Chicago Bulls ("Bulls"), that WGN Continental Broadcasting Company ("WGN") could televise as a superstation. Our opinion and decision are reported in 754 F.Supp. 1336–64 (N.D.Ill.1991) ("*NBA I* "). We there set out at some length the history of the NBA and of superstation telecasts of NBA games by the three superstations, WTBS, Atlanta, WGN, Chicago and WWOR, New York. We also discussed the various other arrangements for broadcasting and televising NBA games including national and local television and national and local radio broadcasting. The national and local TV arrangements included both over-the-air and cable transmissions.

In addition, we described the NBA and its teams' operations and relations in general, the extent to which they operate individually and retain the net revenues from their individual operations, and the extent to which they operate jointly through the NBA acting as their agent. The net revenues from these joint operations are distributed periodically by the agent, the NBA, in equal shares to

each member team. The joint operations include both national over-the-air and cable televising and radio broadcasting of NBA games but not local or regional over-the-air or cable televising or radio broadcasting of games involving a local team.

We further pointed out that the NBA through joint action of the teams has established numerous rules and regulations governing many subjects including how many players are allowed on the court, the height of baskets, timing limitations, the number of players a team may carry, the size of the court, facilities which the home team must provide, and a host of other game and operational rules.

The league, again acting as agent for the member teams, also handles all sales, outside a team's home arena, of merchandise and memorabilia utilizing team or NBA logos. Again the net revenues are distributed equally among the member teams.

Finally, we also analyzed at length the application of the federal antitrust laws, as well as possible exceptions thereto including the Sports Broadcasting Act ("SBA"). We concluded, and the court of appeals affirmed, that, consistent with the United States Supreme Court's holding in *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), the NBA's proposed reduction in the number of Bulls' games over WGN was a naked and unreasonable restraint on output and distribution which violated the federal antitrust laws and was not exempted therefrom by the Sports Broadcasting Act.

Except for a number of formal changes and the events which have taken place subsequent to our 1991 opinion and which we will discuss later, the NBA, the member teams and the relationship between them, including the many rules and regulations, remain substantially the same as described and found in our 1991 opinion, and we will not repeat them

here but will adopt them as part of our current findings of fact.

The parties have stipulated some 481 uncontested facts. We adopt all of them except numbers 4–6, 30–31, the last sentence of 88, 104–105, 110–111, 118–119, 122–125, 129–135, 145–150, 154–160, 223, 248–249, 251–252, 333, 368, 439–445, 447, which are either irrelevant to the issues before us, or which have previously been found in our 1991 opinion and are, therefore, repetitious.[1]

In addition to the foregoing, certain narrative additional facts may be found in the course of this opinion.

Our 1991 decision and the injunction were affirmed by the Seventh Circuit. 961 F.2d 667 (7th Cir.1992) (*"NBA IA"*). When the Supreme Court denied certiorari, 113 S.Ct. 409 (1992), the decision and injunction became final.

Following the entry of the injunction prohibiting the NBA from reducing the number of Bulls games WGN could carry from 25 to 20, the NBA agreed that for the 1991–92 season the number of games superstations could carry would be 30. That agreement was extended by the NBA for the 1992–93 and 1993–94 seasons. In all three seasons, WTBS and WGN televised 30 games. For the current 1994–95 season, the NBA has agreed only to the 25 games specified in the injunction.

The earlier proceedings dealt only with the question of whether or not the NBA could reduce the number of Bulls games which could be televised over WGN from 25 to 20. The NBA now seeks a decision that, notwithstanding the earlier decision and injunction, it may prohibit any distribution of Bulls games by WGN or, if not, that it may impose a superstation fee or tax on the transmission of Bulls' games by WGN.

The Bulls and WGN, on the other hand, seek the right to televise up to 41 Bulls games on WGN. They contend that any NBA limitation on the number of Bulls'

---

**1.** Several of the factual findings in the opinion are followed by source citations to the record. These citations have been abbreviated as follows: "Tr." marks a citation to the trial transcript; "PX," "DX," and "JX" refer to plaintiffs', defendant's and joint trial exhibits; "SF" is a citation to the parties' joint list of undisputed, stipulated facts; "Dep." refers to deposition testimony by a witness who did not appear live at trial.

games on WGN is a naked restraint in violation of the antitrust laws unless it can be shown to be procompetitive. They assert that there are three restraints at issue in this case: (1) a total ban on superstation telecasts of Bulls' games; (2) the ban against any club televising its games over a superstation on the same night any NBA game is being televised over TNT or WTBS, the blackout restraint; and (3) the so-called superstation tax.

In the course of its opinion affirming our decision and injunction, the court of appeals suggested a number of actions which the NBA might take in an effort to achieve its objectives, while at the same time avoiding the two decisions and the injunction, as well as the application of the antitrust laws.

Notwithstanding that the NBA had voluntarily agreed to 30 Bulls games being televised over WGN in the three seasons, 1991–92, 1992–93 and 1993–94, the appeals court's suggestions as to how the NBA might prevent all such telecasts effectively eliminated the very real possibility of a negotiated settlement of the case. After stating, in its discussion of the SBA, that "Recognition that special interest legislation enshrines results rather than principles is why courts read exceptions to the antitrust laws narrowly, with beady eyes and green eyeshades," *NBA IA*, 961 F.2d at 671–72, the court made a number of suggestions to the NBA as to how it might prohibit and prevent national distribution of Bulls' games by WGN without violating the antitrust laws.

Among the suggestions were the following:

1. Establish that the league is a "single entity" so that whatever it does is unreviewable under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) and its progeny.

2. Transfer all team copyrights to the NBA.

3. Invoke the protection of the SBA by transferring all telecast rights of NBA games whether national or local to the NBA and then put a cap on the number of national telecasts of NBA games in the contracts with NBC and Turner.

4. Demonstrate that a limitation on the distribution of Bulls' games on WGN "expands output, serves the interests of consumers and should be applauded rather than condemned." *NBA IA*, 961 F.2d at 673. To do this, the court suggested that the NBA might try to establish that keeping popular games off superstations helped weaker teams attract support of their local audiences and increase their gate receipts, which is a principal source of team revenues, while at the same time attracting larger audiences, an expansion of output.

5. Attempt to establish that the elimination of all Bulls' games on WGN will cause WGN and the Bulls to suffer no "antitrust injury," i.e., loss that comes "from acts that reduce output or raise prices to consumers." *NBA IA*, 961 F.2d at 670. In this connection, the court speculated on who, under antitrust law, are the "consumers" of TV sports broadcasts, sports fans who watch the games or advertisers who buy the opportunity to persuade viewers to purchase their products and suggested that this question "be explored further in the proceedings yet to come." *Id.*

6. Have the league impose a superstation fee or tax which would produce income for the teams since it would be shared equally and would eliminate any "free-riding" by the Bulls and WGN.

Not surprisingly, the NBA almost immediately undertook to implement the various suggestions. Within a few months, it moved to have the injunction lifted and vacated, representing that it had taken the steps suggested by the court of appeals.

Except for the actions taken in an effort to adopt the court of appeals' suggestions, however, the NBA remains today as described in our earlier opinion, a league of professional basketball teams, each individually owned and controlled except as affected by league rules. Moreover, a limitation on or a prohibition of distribution of any Bulls' games over WGN is still a naked restraint. Accordingly, a logical approach to a decision in this case is, we believe, to examine the changes which

the NBA has made and which it contends entitle it to prohibit the telecasting of any Bulls' games over superstation WGN. If we conclude that such a blanket prohibition is not in violation of the antitrust laws, there will be no necessity to consider the lesser restraints which the plaintiffs challenge, the superstation blackout or the superstation tax. We proceed then to consider the significance and effect of the several changes.

## I

### THE SINGLE ENTITY THEORY

■ In *NBA I*, we discussed, in detail, the organization of the NBA and its member teams. We examined the rule making authority and the economic significance of the league, along with the extent to which the teams cooperate and compete to promote their combined and individual interests and success. We concluded that the NBA is a joint venture of rival teams, necessarily cooperating in the production of games, yet competing for media attention, fan support, general managers, coaching staffs, players, championships, prestige and, last but not least, profits. *NBA I*, 754 F.Supp. at 1339–42. The court of appeals affirmed this analysis, yet suggested, without indicating what of significance had not been considered, that the parties should "join issue" more fully in the proceedings to follow. *NBA IA*, 961 F.2d at 672–73. The parties obliged, and we once again consider the structure of the NBA.

The NBA relies upon *Copperweld*, 467 U.S. 752, 104 S.Ct. 2731, and its progeny for the proposition that, despite its 27 or more independently owned and managed teams, it is a single enterprise. It argues that *Copperweld*, which held that a corporation and its wholly owned subsidiary are a single enterprise for purposes of § 1 of the Sherman Act, can be broadly applied to exempt the NBA from antitrust liability. We disagree.

The holding of *Copperweld* is quite narrow, and rests solely upon the fact that a parent corporation and its wholly-owned subsidiary have a "complete unity of interest," in which the "the subsidiary acts for the benefit of the parent," and "the parent may assert full control at any moment." *Copperweld*, 467 U.S. at 771–72, 104 S.Ct. at 2741–42. The NBA maintains that the "economic reality" of its operations demonstrates such a collective interest. An analysis of the facts, however, discloses that the singularity of purpose and control underlying *Copperweld* is conspicuously absent in the relationship between the NBA and its member teams.

The NBA urges that subsequent case law, particularly, *City of Mt. Pleasant v. Associated Elec. Co-op., Inc.*, 838 F.2d 268 (8th Cir. 1988), has broadened the scope of *Copperweld*'s protection against antitrust violation to include other legally distinct, yet substantively unified, business organizations.[2] Rather than supporting the argument that the NBA is in reality a single entity, however, these later decisions highlight facts that distinguish the NBA from those entities treated as single enterprises under antitrust law. Specifically, as *Mt. Pleasant* makes clear, a single enterprise does not exist when any of the joint members has "pursued interests diverse from those of the cooperative itself." By diverse, the court went on to state "we mean interests which tend to show that any two of the defendants are, or have been, actual or potential competitors." *Mt. Pleasant*, 838 F.2d at 276; *see also Sullivan v. National Football League*, 34 F.3d 1091, 1099 (1st Cir.1994).

As noted above, and at length in *NBA I*, the teams comprising the NBA pursue the very type of diverse interests that *Mt. Pleasant* indicated must be absent. The NBA teams are actual competitors, not only on the baseline for points, but also off the court in the market for players, coaches, managers, advertising dollars, fan support, ticket sales, and overall revenues. They keep their own profits and generally earn far more for themselves than they do through their combined

---

**2.** The NBA also cites, among others, *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1317 (8th Cir.1986); *Williams v. I.B. Fischer Nevada*, 794 F.Supp. 1026, 1031 (D.Nev.1992), *aff'd*, 999 F.2d 445 (9th Cir.1993); *Levi Case Co. v. ATS Prods., Inc.*, 788 F.Supp. 428, 430 (N.D.Cal.1992); *Guzowski v. Hartman*, 969 F.2d 211, 214 (6th Cir. 1992).

efforts as a league.[3] Winning season games, playoffs and championships translates into greater financial prosperity for the victors. *See* Tr. 5998–6000 (Colangelo). One team's gain on the court is thus generally another's loss at the bank, and while some cooperation is necessary, the profit seeking interests of one team are often contrary to those of other teams.[4]

Similar to the lack of "complete unity of interest," is the NBA's limited control over the actions of the individual teams. Each team is independently owned and operated, elects its own directors and officers, hires its own employees, conducts its own accounting, keeps its own profits, makes its own financial and investment decisions, and generally succeeds or fails on its own. Some teams have an interest in the arena in which they play. Others do not. While the teams have consented to be bound by their joint venture agreement and certain rules and regulations adopted by the Board of Governors[5], the individual, corporate and, in one instance, the Boston Celtics, public team owners, do not report to the league, nor does the league have the power to review or disapprove their business decisions. Tr. 3962, 4405–13 (Stern). Moreover, the NBA Constitution specifically prohibits any one team from exercising control over another. JX 69 at 6044.

The NBA claims that, regardless of each team's independent management, profit motives, ownership and control, the individual teams have no economic significance of their own. In support, it argues that the teams are nothing if not a creation of the league, and that "no team, standing alone, has the productive capacity to produce a single NBA game, much less a season of integrated games leading to a championship." A look at some historical facts, however, is revealing. The NBA was not the first professional basketball league, but instead was formed in 1949 by the merger of two pre-existing leagues, the Basketball Association of America ("BAA") and the National Basketball League ("NBL"). SF ¶ 383. Therefore, rather than the teams being creations of the league, the NBA can more accurately be described as a creation of the teams, who can dissolve it at any time by a three-fourths vote. JX 69 at 6061.

Equally instructive is the fact that a separate professional basketball league, the American Basketball Association ("ABA"), competed successfully with the NBA from 1967 to 1976. SF ¶¶ 414–23. Professional basketball teams have, therefore, "produced" games both prior to and independent of the NBA, and conceivably could do so without the NBA again in the future.[6] Unlike the parent and subsidiary in *Copperweld,* the NBA is at its core a joint venture of "two or more entities that previously pursued their own interests separately." *See Copperweld,* 467 U.S. at 790, 104 S.Ct. at 2752.

There is no doubt that the NBA, like any sports league, has cooperative characteristics. Mutual agreement is necessary to create the "product" of competitive basketball games and to insure its quality.[7] Moreover,

---

3. *See NBA I,* 754 F.Supp. at 1339–42.

4. Testimony at trial elicited numerous examples of actions by individual teams that were opposed by and ran counter to the best interests of the NBA or other teams. For example, the Portland Trailblazers signed a contract with Chris Dudley that the league office opposed, and the Clippers moved from San Diego to Los Angeles to compete directly with the Los Angeles Lakers who had earlier moved from Minnesota. Tr. 5985 (Colangelo), 7023–25 (Fisher).

5. The Board of Governors of the NBA is comprised of one representative entitled to one vote from each of the 27 or more member clubs. SF ¶ 48. The teams have also entered into agreements on game rules, as well as collective bargaining arrangements with players, the college draft, group insurance, and the licensing of certain products and national television contracts. SF ¶ 52.

6. Testimony at trial revealed that 12 of the present 27 NBA teams have played professional basketball separate from the NBA at some point. Four of those teams competed directly against NBA teams as members of the ABA, including the New Jersey Nets who compete today with the New York Knicks within the NBA much as they did between leagues when the Nets were part of the ABA. Tr. 3747–52 (Stern).

7. *See NCAA,* 468 U.S. at 101–02, 104 S.Ct. at 2960–61; Michael S. Jacobs, *Professional Sports Leagues, Antitrust, and the Single–Entity Theory: A Defense of the Status Quo,* 67 Ind.L.J. 25 (1991); R. Bork, *The Antitrust Paradox* 278 (1978).

the member teams undoubtedly derive genuine financial benefit from their combined efforts.[8] The NBA confuses, however, the necessary and beneficial cooperation of a joint venture, with the unified interests of a single entity. When independent actors join in order to achieve mutual benefit, or even to accomplish what they could not on their own, the result is not automatically exempt from antitrust scrutiny. *NCAA*, 468 U.S. at 133, 104 S.Ct. at 2976. Rather, it frequently mandates particular scrutiny as in the case of competitors who join together to fix prices. Thus, while the unique needs and structure of the NBA demand that we carefully review its joint agreements for procompetitive effects, they do not support the conclusion that the NBA is a single entity.[9]

Although we are the first court to consider the organizational status of the NBA under § 1 of the Sherman Act, we are not the first to consider whether sports leagues should be treated as single entities. Scholarly debate has been plentiful and arguments similar to those presented to us have been made in relation to other sports organizations. *See McNeil v. National Football League*, 790 F.Supp. 871 (D.Minn.1992).[10] We have reviewed these discussions and find the better reasoned ones support the result reached here. Of particular relevance to our decision, we note *Sullivan v. National Football League*, 34 F.3d 1091 (1st Cir.1994), in which the First Circuit recently rejected substantially identical arguments about the application of *Copperweld* to the significantly more integrated National Football League.[11]

After over nine weeks of trial, more than 1400 exhibits, and lengthy submissions, we find no material factual changes in our original analysis, nor in the NBA, that lead to anything but the conclusion previously reached—the NBA is a joint venture of competing teams capable of colluding in violation of § 1 of the Sherman Act.

## II.

### THE EFFECT OF THE TRANSFER OF THE TEAMS' COPYRIGHTS TO THE NBA

■ Both our earlier opinion and that of the court of appeals pointed out that, while the NBA contended the contrary, the individual teams apparently owned the copyrights to their games, programs and other copyrighted products. We noted that, while two teams obviously own the copyrights to any particular game, either of two joint owners of a work may grant a non-exclusive license to a third party without the permission of the other and that all NBA teams do exactly that in connection with the television and radio broadcasting of their games and the sale of other copyrighted products involving more than one team.

We also noted that the NBA in all of its contracts acts only as an agent for the teams, not as a principal or copyright licensor. This includes television and radio over-the-air and cable contracts, souvenir, memorabilia and all other contracts with manufacturers and distributors of copyrighted products. Acting as agent is important to the NBA and the member teams because, as agent, the NBA is not subject to federal and state income and other taxes on the many millions of dollars it receives each year under all the various contracts.

In an effort to prevent individual teams, like the Bulls, from licensing distribution of their copyrighted games without NBA consent, the commissioner recommended and

---

8. We discussed these benefits at length in *NBA I*, 754 F.Supp. at 1340.

9. *See Sports, Antitrust, and The Single Entity Theory*, 63 Tul.L.Rev. 751 (1989).

10. *See also L.A. Memorial Coliseum Comm. v. NFL*, 726 F.2d 1381 (9th Cir.), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984); *North American Soccer League v. NFL*, 670 F.2d 1249 (2d Cir.), *cert. denied*, 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982).

11. As noted in *NBA I*, the money earned and distributed by the NBA represents only 15–20% of the gross revenues of the more successful teams. In contrast, approximately 70% of the total revenues of teams in the National Football League are derived from the league and shared equally. Moreover, Paul Tagliabue, the Commissioner of the NFL, estimated that only 5–10% of a team's revenues "is not shared in any way." *NBA I*, 754 F.Supp. at 1341, *citing* Tagliabue Dep. at 69–71.

the teams, with some dissents, voted to transfer all of their copyrights to the league. Theoretically, at least, the league now owns all team copyrights. Because the NBA rules have for many years permitted teams to license local and regional over-the-air and cable television as well as radio transmission of their games, and to sell copyrighted products in their own stadiums, the NBA promptly authorized the individual teams to continue to do so after it acquired the copyrights. It should be noted that it did not, however, purport to license them under the copyrights which it now ostensibly owns.

As previously noted, in its multi-million dollar contracts with NBC and cable TV companies, as well as with the manufacturers and distributors of other copyrighted products, the NBA has always acted as agent for the various teams. Since ostensibly acquiring ownership of the copyrights, the NBA has entered into a number of new contracts including ones with NBC and the Turner TNT cable network and superstation WTBS. Notwithstanding that the NBA now purportedly owns the copyrights and would presumably license the distribution of copyrighted games, the new contracts carefully identify the NBA, not as a licensor or principal, but again as agent for the teams. When we questioned counsel for the NBA during oral argument about this apparent inconsistency, the possible tax implications and whether or not the copyright assignments were substantive or merely nominal, it was suggested that we should recognize that the NBA owned them and could prohibit any team from entering into any contract involving copyrighted NBA products, even though the league itself did not purport in its own contracts to act as the owner and licensor of the copyrights. And so far as any tax implications were concerned, we were advised that they should be no concern of ours in evaluating the significance or lack thereof of the copyright transfers, but that the NBA would handle any tax questions when and if the issues arose. Tr. 8153, 8162 (Rauchberg).

The ultimate fact is that there has been no change in either the teams' rights to enter into contracts involving local and regional TV or radio transmission of NBA games and the sale of other copyrighted products, or in the league's continuing in all of its contracts to act as agent for the teams and not as the owner and licensor of the copyrights.

The court of appeals in its opinion pointed out that "We want to know the effects of the TV policy on consumers' welfare, not whether the league possesses sufficient contractual rights that it has become the 'owner' of the copyright." *NBA IA*, 961 F.2d at 674. We conclude from all of the foregoing that the nominal transfer of the various teams' copyrights to the NBA does not immunize it from the application of the antitrust laws.

In this connection, it should be noted that the NBA claims that, as nominal owner of the copyrights in all NBA game telecasts, it has a congressionally-granted right to license or not to license whomever it chooses, and its decision to license some telecasters and not others is beyond antitrust challenge. The NBA further argues that joint ownership does not change the nature of these rights, and in support of this statement quotes the Supreme Court in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L. Ed 610 (1939) ("[O]wners of the copyright of a motion picture film acquire the right to exhibit the picture and to grant an exclusive or restrictive license to others to exhibit it.").

The NBA's reliance on *Interstate Circuit* is ill-placed. Although the Supreme Court recognized that copyright holders may grant an exclusive or restrictive license to others, the Court also noted that monopoly rights associated with a copyright have certain limits, restraint of trade in order to suppress competition being one of them. The Court stated, "[a]n agreement illegal because it suppresses competition is not any less so because the competitive article is copyrighted. The fact that the restraint is made easier or more effective by making the copyright subservient to the contract does not relieve it of illegality." *Id.* at 230, 59 S.Ct. at 476.

In fact, "[i]t is ... well settled that concerted and contractual behavior that threatens competition is not immune from antitrust inquiry simply because it involves the exercise of copyright privileges." *Data General*

*Corp. v. Grumman Systems Support Corp.,* 36 F.3d 1147, 1185 n. 63 (1st Cir.1994), citing *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, —— n. 29, 112 S.Ct. 2072, 2089 n. 29, 119 L.Ed.2d 265 (1992).

The NBA's decision to restrict the availability of games in the national television market has the potential to restrain trade beyond that contemplated by the copyright laws. The ultimate purpose of a copyright is to promote artistic creativity for the public good. *See Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 2043, 45 L.Ed.2d 84 (1975). To accomplish this end, the immediate effect of the copyright laws is to secure a fair return for the author's labor. *Id.* Thus, the " 'rewards which flow to the [copyright owner] and his licensees from the suppression of competition ... must be reasonably adapted to secure pecuniary reward for the [copyright owner's] monopoly.' " *United States v. Paramount Pictures,* 334 U.S. 131, 144, 68 S.Ct. 915, 923, 92 L.Ed. 1260 (1948) *(quoting United States v. U.S. Gypsum Co.,* 333 U.S. 364, 400, 68 S.Ct. 525, 544, 92 L.Ed. 746 (1948)).

The NBA is entitled to recover a fair return for its grant, as agent of the teams, of licenses in the telecast of basketball contests, but it is not entitled to exploit its copyrights by using that monopoly power in order to limit distribution and consumption of its product or to inflate artificially its value. Here, the restricted grants of games to NBC and Turner Broadcasting and the proposed elimination of all Bulls games on WGN have the effect of decreasing the number of games available in the national television market. Decrease in output is anticompetitive, not only because viewers have fewer games to watch, but also because decreased supply typically increases prices. *See NCAA,* 468 U.S. at 100, 104 S.Ct. at 2959. In addition to the increase in market value of the games, the prices of advertising during the games also rises. Such a result cannot be justified or excused simply by copyright ownership.

Even if the copyright laws could protect the restriction in output contemplated by the NBA agreements, the NBA cannot seek shelter in the copyright laws unless it is acting in a way which is necessary to protect its property interest in its supposed copyright monopoly. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). Absent specific justifications for the restraints, the restriction in competition will not be shielded from the antitrust laws.

As will be discussed later, the NBA has presented no evidence that it has suffered any economic loss as a result of the superstation telecasts of NBA games or would have sold more games to NBC, Turner or any other national TV distributor, or received more income if WTBS and WGN had not each distributed 30 NBA games for the past three years. The restraint is clearly not necessary to protect the teams' or the NBA's interests in their copyrights.

### III.

### THE EFFECT OF THE TRANSFER BY THE NBA OF ALL TELEVISION RIGHTS TO NBC AND THE APPLICATION OF THE SPORTS BROADCASTING ACT

In *NBA I,* we concluded that the NBA was not entitled to antitrust protection under the SBA because "[t]he Bulls, not the NBA, both owned and licensed the rights to the five games that were transferred to WGN and which the 5–game reduction would eliminate. This was not a sale or transfer by 'any league of clubs' but rather by the Bulls themselves, though subject to league approval, and the antitrust laws therefore apply." *NBA I,* 754 F.Supp. at 1350. We also concluded that while the SBA exempted from antitrust laws agreements to transfer telecasts, it did not exempt agreements to restrain or prohibit transfers of national broadcast rights.

The court of appeals affirmed in *NBA IA* and agreed that the SBA applies only when a league has transferred rights to sponsored telecasting and therefore it did not apply to the NBA's efforts to limit distribution by the Bulls of their games on WGN. The appeals court then suggested several ways the NBA might structure its agreements in an effort to come within the provisions of the SBA. In

dicta, the court of appeals disagreed that the SBA distinguishes between transfers and prohibitions of transfers, exempting only the former from the antitrust laws. *NBA IA,* 961 F.2d at 670 ("We therefore disagree with the district court to the extent it thought that the Sports Broadcasting Act applies only when the league arranges for (or permits) telecasting of every contest"). Notwithstanding, it agreed that the SBA did not exempt the NBA's attempt to reduce distribution of Bulls games over WGN from the antitrust laws.

At a meeting of the NBA Board of Governors, the teams passed several resolutions, apparently in an effort to capitalize on the suggestions made by the court of appeals. *See* JX 114. Relevant are the following resolutions:

(1) the members of the NBA amended the NBA's by-laws to provide that the copyright in *all* NBA game telecasts was reserved to the NBA, rather than to the individual teams.

(2) The members of the NBA authorized the NBA to enter into a new national television contract with NBC that:

(a) transferred from the NBA, as agent for its member teams, the exclusive right to televise all NBA games;

(b) provided permission from NBC to the NBA to license to national cable networks (including superstations) the right to telecast up to 85 games, with a limit of 15 appearances by any one team; and

(c) provided permission from NBC to the NBA to exercise (or authorize its member teams to exercise) all rights to local and regional commercial broadcast television and local cable television;

(3) the members of the NBA authorized the individual teams, in accordance with the permission to be granted by NBC to the NBA, to "exercise all rights to local and regional commercial broadcast television and local non-broadcast television" as those rights were to be defined in the new NBC contract;

(4) the members of the NBA repealed their prior rule that limited to 25 the number of NBA game telecasts that any individual team could license to a local broadcast station whose signal is nationally delivered (e.g., superstations); and

(5) the members of the NBA determined that if, despite the transfer contained in the NBC contract, a team were permitted to license national telecasts of NBA games to a superstation, it would be required to pay a fee to the NBA representing "the fair market value of superstation telecasts in the national market."

The effect of these resolutions and the new NBC contract (*see* JX 100), so far as the individual team's local and regional television arrangements are concerned, is that they are exactly the same as they were before the rights to televise all 1107 regular season NBA games were ostensibly given to NBC. For while NBC theoretically received the rights, it simultaneously gave back the rights to all but 25 or 26 and the NBA promptly authorized the individual teams to continue with existing or to enter into new contracts with respect to local and regional over-the-air and cable televising of their games. The NBC contract did not impact on the NBA–Turner enterprises contract either, since the latter only contracted for 70 of the 85 excepted national cable regular season games, 45 on TNT and 25 on WTBS.

As Duncan Ebersol, President of NBC Sports stated during the trial, he was concerned only about the 25 or 26 regular season plus the play-off games he was contracting for and, so long as he was protected from competition with respect to those games and no other national over-the-air network could televise NBA games, he didn't care what language the attorneys put into the contract with respect to the other non over-the-air telecasts. So long as it continued to have exclusive rights to televise the games it selected and have no other games being televised at the same time, or another over-the-air network like CBS or ABC televising NBA games, NBC was content. That, even though the new NBC contract specifically authorizes 25 Bulls games on WGN so long as the injunction remains in effect as well as the non over-the-air televising of 85 other regular season NBA games.

On September 22, 1993, the members of the NBA authorized the league to enter into an agreement with the Turner broadcasting system's TNT and WTBS networks. This contract confers upon Turner the exclusive national cable network rights to telecast 70 of the 85 NBA regular season games that the NBA, under the NBC agreement, is authorized to license to national cable networks. As part of the NBA's agreement with Turner, 25 regular season games will be telecast each season on Superstation WTBS and 45 regular season NBA games will be telecast each season on TNT. JX 200.

·Although we concluded in *NBA I,* and the court of appeals agreed, that the SBA did not apply, we must now consider whether the resolutions adopted at the Board of Governor's meeting bring the NBA's restriction on superstation broadcasts within the confines of the SBA, thus exempting it from antitrust scrutiny. The plaintiffs contend that the SBA does not apply because the member teams still control the rights and thus the transfers are not by the league of teams. During the first trial, much emphasis was placed on the fact that the NBA did not own the copyrights in the telecasts although it contended that it did. In response to this concern, the member teams formally resolved to transfer all copyrights in the games to the NBA. The plaintiffs claim that this was a sham because the resolution placing copyright ownership in the NBA did not change any of the substantive rights of the league or the member teams since the NBA immediately authorized the teams to sell copyrighted products, including TV and radio transmission of their games, just as they had before the ostensible transfer. They contend that this is evidenced by the fact that the member teams, not the NBA, continue to receive the income from the licensing of all telecasts, local, regional and national. They argue that this transfer was solely in form, and not in substance, and in effect the teams as the principals, with the NBA only their agent, are still transferring the rights to local, regional and national televising of NBA games. Accordingly, they argue, the SBA does not apply.

Section 1291 of the Sports Broadcasting Act provides:

> The antitrust laws ... shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sport[ ] of ... basketball ..., by which any league of clubs participating in professional ... basketball ... sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games ... engaged in or conducted by such clubs.

15 U.S.C. § 1291.

After our decision in *NBA I,* the league appointed a planning committee to consider what further action the NBA might take. In its third report, the committee noted that "[a]s a practical matter, the NBA has, for more than a decade, already exercised full control over the incidents of ownership of the copyright in all telecasts of NBA games." JX 110 at 22. This, notwithstanding the fact that we and the court of appeals both found that the individual teams held the "full copyright interest in all games that the league has not sold to the networks." *NBA IA,* 961 F.2d at 671. The committee, therefore, had no problem recommending that the member teams formally transfer the copyrights to the league because such a transfer would not change any past practices, but instead would simply confirm what the league and the teams already believed—that the league owned the copyrights.

On the other hand, in an apparent effort to distinguish the league's ostensible ownership of the copyright rights from the individual teams licensing the local and regional televising of their games, the committee did not recommend that the member teams transfer the broadcast rights to the league, stating that "such a step would constitute a significant departure from the traditional League practice of permitting and authorizing each team to enter into local telecast contracts and to retain the revenues from such contracts." JX 110 at 24. The committee was concerned that such a transfer might be considered a material change in the team's contracts with local telecasters, might mean that the league would be responsible for the per-

formance of these contracts, and might have adverse tax consequences because the NBA could then be taxed on the receipt of the substantial local and regional license fees.

We have considerable difficulty with the concept that broadcast rights are separate and distinct from copyright rights. The two, we believe, are inextricably intertwined. One cannot broadcast a copyrighted program without having a license from the owner of the copyright.

At the time of *NBA I*, we understood that the teams as principals and copyright owners had entered into contracts and licenses through their agent, the NBA, with both NBC and TNT for the national over-the-air and cable televising of a limited number of NBA games. The individual teams as principals and copyright owners had also entered into contracts and licenses for the local and regional over-the-air and cable televising of most or all of their games subject only to the exclusive rights of NBC. Finally, the Atlanta Hawks and the Chicago Bulls as principals and copyright owners had each entered into a contract and license with superstations WTBS and WGN, respectively, to transmit a limited number of Hawks games over WTBS and Bulls games over WGN, again subject to the exclusive rights of NBC. This understanding was apparently shared by the court of appeals as evidenced by its statement previously quoted.

To the extent that the NBA now argues that the formal transfer of the copyrights from the member teams alone brings it within the exemption of the SBA, the plaintiffs are correct that this transfer, on its own, accomplished nothing so far as the SBA is concerned. The SBA specifically relates to the sale or transfer "of the rights of such leagues' member clubs in the sponsored telecasting of the games ... engaged in or conducted by such clubs." Under the SBA, ownership of the copyrights by the league is irrelevant and unnecessary, since the statute contemplates that the league will be transferring the rights of the member clubs and not rights it owns.

At the time it entered into the contract with NBC, the NBA was authorized by the 1993 resolutions to transfer, as agent for the member teams, the television rights to all NBA games to NBC, so long as NBC gave back the rights to 85 games which could be sold to national cable networks including superstations, and also gave back the rights to over-the-air and cable local and regional televising of team games which the NBA immediately authorized the teams to sell. As a result, the only change in the prior arrangements was that the member teams were no longer authorized to enter into contracts for telecasts of games with superstations, that provision having been repealed except that the contract recognized the Bulls and WGN's rights under the injunction to televise 25 games.

Accordingly, when the NBA entered into the agreement with NBC, as it had in previous NBC contracts, it "transferred at least part of the rights of the league's member clubs in the sponsored telecast of the game[ ] of ... basketball...." Thus, on its face, the transfer falls within the language of section 1291 of the Sports Broadcasting Act.

This, however, does not end the inquiry, for not only must the league have transferred certain rights, but it must also meet the other requirements of the Act, one of which is that the agreement *not* prohibit the broadcast of games in certain areas. Section 1292 of the Sports Broadcasting Act provides:

> Section 1291 of this title shall not apply to any joint agreement described in the first sentence in such section which prohibits any person to whom such rights are sold or transferred from televising any games within any area, except within the home territory of a member club of the league on a day when such club is playing a game at home.

15 U.S.C. § 1292. This section "partially removes the exemption [of section 1291] ..., thus making a *restriction* on the televising of games illegal, *except* 'within the home territory' of a club playing at home." *WTWV, Inc. National Football League,* 678 F.2d 142, 144 (11th Cir.1982).

The NBA–NBC agreement is inconsistent with section 1292. The agreement between the NBA and NBC purportedly transfers the exclusive rights to televise all regular season

NBA games to NBC. JX 100 at 1. According to the agreement, NBC agrees to broadcast on its national over-the-air network "no fewer than twenty-five (25) and no more than twenty-six (26) regular season Games...." *Id.* at 10. NBC also agrees not to televise, or authorize or license any other party to televise, any other NBA game by any means of broadcast or non-broadcast television. *Id.* Notwithstanding the supposedly exclusive grant, the agreement then retransfers to the NBA the rights in all the remaining (some 1081 or 82) games not shown by NBC, subject to certain limitations. Under the agreement, NBC permits the NBA to license to cable networks, including superstations, up to 85 games, permits the NBA to enter into agreements for subscription and pay-per-view transmission of games [12], and permits the NBA to exercise, or authorize member teams to exercise, all rights to local and regional broadcasts. *Id.* at 1–2.

Thus, under the plain terms of the contract, no more than 111 games can be televised nationally. While the contract does not specifically prohibit the broadcast of the some 1,000 remaining games outside the local and regional areas, the effect of the transfer of rights to NBC, with a transfer back of the rights to all but 25 or 26 games, subject to the 85 game limit on the number of national telecasts that the NBA may license elsewhere, is precisely that. Both the transfer of up to 26 games and the subsequent limit on the national broadcast of the remaining games are part of the same agreement, and the ultimate effect of this agreement is to drastically limit the number of games shown in the national marketplace. Section 1292 specifies that such an agreement is not covered by section 1291, and thus is not exempt from antitrust analysis. Accordingly, under the plain language of the SBA, antitrust immunity is not granted to joint agreements, such as this one, because the SBA only allows restrictions within the home territory of a club playing at home, and does not grant a blanket exemption for broad reductions in output as the NBA–NBC contract seeks to do.

This interpretation and application of section 1292 is supported by the legislative history of the Act. The SBA was enacted in 1961 to overrule the effect of *United States v. National Football League*, 196 F.Supp. 445 (E.D.Pa.1961). In that case, the court invalidated a contract between the NFL and CBS which awarded CBS the exclusive broadcast rights to all NFL games, but required CBS to black out telecasts of a team's games into the team's home territory whenever the team was playing at home. Judge Grim's decision had the practical consequence of preventing the NFL from entering into agreements to sell the pooled television rights of its member clubs, and section 1291 was drafted to allow the sale or transfer of these rights to networks. *See* S.REP. No. 1087, 87th Cong., 1st Sess. (1961), reprinted in 1961 U.S.C.C.A.N. 3042.

The potential breadth of the antitrust exemption granted by this section was recognized by its drafters and opponents. Concern was expressed that the original bill, codified in section 1291, provided a blanket antitrust exemption for pooled telecast agreements which potentially could extend far beyond the limited purposes which the Act was enacted to accomplish. As a result, an amendment to the Act was proposed and later codified as 15 U.S.C. § 1292.

As the legislative history demonstrates, the specific purpose of section 1292 was to eliminate SBA application to contracts providing for blackouts of games, except blackouts in the home territory of teams in order to protect home ticket sales. Prior to the enactment of the SBA, the following dialogue took place at the hearing before the antitrust subcommittee of the House of Representatives:

> *MR. HOLTZMAN.* Mr. Chairman, the very language of the bill says:

**12.** This type of agreement is not covered by the Sports Broadcasting Act because the SBA only applies to agreements regarding "sponsored telecasting." While telecasting on TNT may be considered sponsored telecasting because TNT does receive some revenues from advertising in addition to subscription fees, *see Chicago Pro. Sports Ltd. Partnership v. National Basketball Ass'n*, 808 F.Supp. 646, 649–51 (N.D.Ill.1992), pure subscription or pay-per-view telecasts clearly are not considered sponsored telecasting.

Shall not apply to any joint agreement by or among persons ...

and so forth.

It would seem to me that this would give carte blanche to black out at any time. Would you agree, Mr. Carothers?

MR. CAROTHERS. I think it would. I think the language is broad enough to do that. But that is so far removed from our objectives.

*Telecasting of Professional Sports Contests: Hearings on H.R. 8757 Before the Subcomm. on Antitrust of the House Comm. on the Judiciary,* 87th Cong., 1st Sess. 30 (1961) (Statements of Lester Holtzman, subcommittee member, and Hamilton Carothers, counsel for National Football League). The committee members were also concerned that, under the language of the proposed act, the NFL could black out games to a team's home area even when the team was not playing at home. *Id.* In response to these concerns, the subcommittee proposed an amendment which was in all relevant respects identical to the language now contained in section 1292. Thus, this section was specifically drafted to exclude contracts limiting or prohibiting sponsored telecasting other than in the home team's area.

Here, the effect of the joint agreement between the NBA and NBC is to black out throughout most of the nation all but the 25 games shown on NBC and the 85 games which may be shown on national cable networks or superstations. The remaining games will be broadcast only to viewers in the local or regional areas of the two teams engaged in the particular contest. The SBA specifically excludes such contracts from antitrust exemption.

The NBA is attempting to use a very narrow SBA antitrust exemption to avoid scrutiny of its restrictions on the number of NBA games which can be broadcast nationwide. As we have commented previously, antitrust exemptions should be narrowly construed. *See, e.g., Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979). In addition, the Supreme Court "has strictly construed antitrust exemptions even where a broader interpretation was reason-able." *See WTWV, Inc.,* 678 F.2d at 145 (*citing Federal Maritime Commission v. Seatrain Lines, Inc.,* 411 U.S. 726, 732–33, 93 S.Ct. 1773, 1778–79, 36 L.Ed.2d 620 (1973); *United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 315–16, 76 S.Ct. 937, 943–44, 100 L.Ed. 1209 (1956)).

Here, the very narrow purpose behind the SBA was to exempt pooled agreements between the NFL and the networks which contain blackouts *only* of games in the home team's territory. The agreement at issue in this case far surpasses this narrow exemption. In fact, the NBA has created telecasting arrangements which were considered during the legislative hearings and for which changes were made to the proposed legislation in order to prohibit the result the NBA seeks to reach by its agreement with NBC— a substantial reduction in the number of games available to the public. As the language and the legislative history indicate, the SBA was never intended to provide antitrust immunity to agreements which restrict output in this manner. Construing the antitrust exemption at issue in this case as Congress clearly intended, we conclude that the SBA does not exempt the NBA–NBC agreement from antitrust analysis.

The end result of the NBA's efforts to take advantage of the court of appeals suggestion that in its contract with NBC it might be able to invoke the SBA is that NBC has become a co-conspirator with the NBA teams in the effort to restrain and reduce the national distribution of NBA games. This is incongruous in light of the express statement by NBC's Sports President that NBC was interested only in protecting its exclusivity in the 25 or 26 games it selected. Yet the NBA now contends that the NBC contract provisions and the SBA protect its restraint and limitations without regard to whether or not they are pro-competitive or can be shown to benefit consumers.

It is particularly ironic when one considers that after both the new NBA and Turner contracts were entered into, with one exception, there was no material change in the status quo as it was when the court of appeals and we found that the SBA did not

protect the NBA's efforts to restrain the distribution of its product over superstations by reducing them from 25 to 20. NBC again has the exclusive right to televise nationally 25 or 26 regular season games. TNT again has the right to transmit nationally over its cable system 45 regular season games and superstation WTBS again has the right to 25 regular season games. And the individual teams continue to have the same right to contract for the local and regional TV transmission of their games.

Only the elimination of 30 Bulls games over superstation WGN by the so-called superstation ban is new. This is an extraordinary exercise in elevating form over substance to the detriment of the consuming public, and is an even more significant naked restraint than the elimination of 5 games which we and the court of appeals previously found was not protected by the SBA.

## IV.

### A "QUICK LOOK" RULE OF REASON ANALYSIS AND THE NBA's PRO-COMPETITIVE JUSTIFICATIONS

■ In *NBA I,* we held that the NBA's decision to reduce the number of games that a single team could broadcast over superstations in the national market from 25 to 20 was a naked restraint on output. At that time, the NBA offered numerous explanations as to why this reduction was merely ancillary to a lawful purpose and necessary to promote competition. We thoroughly considered all those justifications and found them wanting in factual support, and the court of appeals agreed. In April 1993, the NBA Board of Governors passed new resolutions which seek to further reduce superstation telecasts and eliminate any ability of individual teams to have their games telecast

in the national market. Now, as before, the NBA argues that its actions are ancillary and procompetitive and therefore do not violate the antitrust laws.

As discussed previously, the 1993 NBA Board of Governors' resolutions, as implemented through the NBA's contract with NBC, provide that for the next four years: (1) NBC will broadcast no fewer than 25 and no more than 26 regular season games, including no more than 8 games involving any single team; (2) the NBA is permitted each year to license a maximum of 85 regular season games to be shown on national cable networks and/or superstations, but no more than 15 games of any one team; and (3) the member teams may contract for the TV and radio broadcasts of any of their regular season games in their local and regional areas, but may not contract with a station whose local signal is distributed to more than 5 million television households outside of their home territory.[13] JX 100 and 114.

These resolutions, like the ones adopted in 1990, represent a horizontal agreement among competitors to divide markets and restrain output. Instead of attempting to reduce the number of Bulls games telecast on WGN by 5, the NBA now seeks to exclude WGN altogether, place an overall limit on superstation telecasts, prohibit individual teams from contracting with superstations, and ultimately reduce the number of games televised nationally as well as the number of consumers who can see them. The result, if approved, will be that out of the some 1,107 or more regular season games played in the NBA[14], only a maximum of 111 will be televised nationwide, 26 over the air on NBC and 85 on cable and/or superstations, and of those, only a total of 23 may feature any single team.[15] SF ¶¶ 434 and 373. For the

---

13. At present, WGN in Chicago, WTBS in Atlanta, and WWOR and WPIX in New York, are the only local broadcast stations that are capable of reaching more than 5 million subscribers outside of any teams' designated market. SF ¶ 18. WPIX does not telecast any NBA games, WWOR is no longer broadcasting Nets games, and, under the new Turner contract, WTBS has stopped carrying only Hawks games. In effect, therefore, WGN and the Bulls are the only parties whose desire to telecast games will be frustrated by the new limitations. Tr. 3811–19, 3919–20.

14. With the addition of the two new scheduled franchises, Toronto and Vancouver, the number of NBA regular season match ups will grow, likely adding 82 new games for a total of 1,189.

15. We note that the NBA has only contracted to telecast 70 of the 85 games allowed under the NBC contract to be shown on cable and/or superstations (45 on TNT and 25 on WTBS). Nationally this represents a 15 game reduction below the 111 game maximum. Note also, however, that as long as this court's injunction remains

Bulls alone, this restriction would mean, in the absence of this court's injunction, at least a 29 game reduction from the 52 Bulls games that were shown nationally over various telecast outlets during the 1992–93 season.[16] SF ¶ 372.

As in *NBA I*, the recent NBA resolutions clearly reduce output well below current market demand. WGN alone is prepared to contract to distribute up to 41 Bulls home games. Along with reducing national output, this collective restriction also has the potential effect of reducing local exposure. WGN, for example, has far greater exposure in the Chicago market than any other available substitute TV station. To the extent that WGN is prohibited from telecasting Bulls games, since it cannot prevent its local signal from being carried nationwide, the Bulls will have to license their games to a much less desirable local TV outlet and suffer a loss in local viewership. Likewise, the NBA's concerted refusal to deal with WGN and its limited dealings with superstations, continue to represent a form of group boycott. *See NBA I*, 754 F.Supp. at 1356 (*citing, Kiefer–Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951) (under the Sherman Act boycotts are boycotts even when they target customers rather than competitors)).

In substance, therefore, the NBA is attempting to do even more drastically exactly what we concluded it failed to justify doing previously—artificially limit the output of NBA games in the national television market. As such, our analysis here is like that in *NBA I*, and is similarly governed by the Supreme Court's holding in *NCAA*.

We note, at the outset, that facially restrictive agreements between competitors that tend to reduce output and limit market forces, such as those at issue here, are ordinarily found illegal per se. *Broadcast Music, Inc.*, 441 U.S. at 19–20, 99 S.Ct. at 1562–1563. Under the guidance of *NCAA*, and the analyses in *NBA I* and *NBA IA*, however,

that type of cursory examination may be insufficient when reviewing the actions of industries, such as sports leagues, that require restraints on trade in order to produce any product at all. This is particularly true when the restraint in question is arguably ancillary to a lawful purpose, or tends to enhance rather than inhibit competition. As we have already recognized, the NBA has many such cooperative characteristics.

Accordingly, before we can reach any conclusion as to whether or not the NBA's most recent restrictions on superstation telecasts violate the Sherman Act, it is necessary to consider whether these restraints ultimately benefit rather than harm the consumer. We therefore apply the "quick look" version of the Rule of Reason, with the goal, as always, of determining "the competitive significance of the [challenged] restraint." *NBA I*, 754 F.Supp. at 1358 (*quoting National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978)). If we can find no satisfactory connection between the NBA's national telecast restraints and an enhancement of marketwide competition, no inquiry into market power will be necessary, and we can condemn the NBA's restrictions on output "without ado." *NBA IA*, 961 F.2d at 674. As the Seventh Circuit has already stated, "any agreement to reduce output measured by the number of games telecast requires some justification—some explanation connecting the practice to consumers' benefits—before the court attempts an analysis of market power." *Id.; see also Polk Brothers Inc. v. Forest City Enterprises*, 776 F.2d 185, 189 (7th Cir. 1985).

We turn then to the procompetitive justifications proffered by the NBA. As an initial matter, we conclude that there is no support for the proposition, which the NBA seems to urge, that the restraints on superstation telecasts are lawful because they are somehow necessary for, or ancillary to, the NBA's production of competitive basketball. A review of the history of the NBA does not

---

unmodified, the Bulls, against the wishes of the NBA, may telecast an additional 25 games nationally over WGN.

**16.** We note also that during the 1991–92 season 50 regular season Bulls games were telecast nationally over various outlets. This number was 43 for the 1990–91 season and 40 for the 1989–90 season. SF ¶ 372.

support the claim that the proposed restrictions on superstation output are necessary for the production of competitive basketball. Moreover, the fact that some agreements between the teams may be procompetitive, and therefore justified, does not make all other league restraints immune from antitrust scrutiny. We repeat up front what we admonished in *NBA I,* "the antitrust laws were enacted for 'the protection of competition, not competitors.'" *NBA I,* 754 F.Supp. at 1359 (*quoting Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). Therefore, any of the NBA's arguments that are premised on the fact that the challenged restraints may "contribute to the success" or help maximize the revenues of the teams or the league are misplaced, unless they benefit consumers by leading to greater output and distribution.

Initially, the NBA argues that the teams' agreement with NBC not to permit competition in the national television market actually fosters an expansion in output by encouraging new teams to join the league, who in turn produce more games, which in turn increases the number of games available for spectators and for local telecast. The NBA cites the 1987 league expansion into Miami, Orlando, Charlotte and Minneapolis, along with the imminent addition of the Toronto and Vancouver franchises, to demonstrate how new teams expand the NBA's market exposure and broadcast output. The weakness in this argument is that the NBA has not demonstrated any causal connection between league expansion and restrictions on superstation telecasts. On the contrary, the four newest NBA teams have been successful, and interest in further expansion has developed, during a period when superstation telecasts have been increasing.[17] JX 114 at 16; SF ¶¶ 151–53.

Similarly, the NBA argues that the new limitations on superstation televising of games will increase the national distribution of the NBA product by improving the league's ability to negotiate contracts with the network and cable stations. The NBA maintains that in 1993, unlike in 1989, NBC and Turner "bargained for" and obtained the NBA's promise that it would only license a limited number of games in the national market, and in exchange agreed to provide substantial coverage of NBA games. These allegedly bargained for limitations, however, are more contrived than real, and clearly do not promote greater NBA distribution. Neither NBC nor Turner, as the evidence showed, would have contracted for fewer games without the limitation. Each bought exactly the maximum number of games it wanted and neither was seriously concerned about WGN's telecasts of Bulls games. Tr. 1791–1805 (Ebersol).

A look at the actual number of games contracted for reveals that the agreements with NBC and Turner result in a net loss, rather than a gain, in national NBA telecasts, even without counting the 30 games the NBA seeks to take away from WGN.[18] Specifically, the 1993 contract with NBC provides that between 25 and 26 games will be shown each of the next four seasons. JX 100. This represents, at best, a one or two game increase over the 24 games shown on NBC during the 1993–94 regular season, the 25 games telecast during 1992–93, and the 24 games carried during 1991–92. SF ¶¶ 217–19; PTX 753. More striking is the comparison between the 1993 contract with Turner and the output of TNT and WTBS over the previous four years. The new agreement provides that during the next four seasons TNT will telecast 45 games and WTBS will show 25. JX 200. From 1989 to 1993, however, TNT telecast 51 games each year, and WTBS telecast 21, 30, 30 and 30 games respectively. SF ¶ 152; JX 143. The new contracts, therefore, rather than increasing national output, create a reduction of as

---

**17.** From 1986 to 1989 no NBA games were telecast on superstations. Beginning with the 1989–90 season, however, superstation coverage increased, with 56 games shown between WGN (25), WTBS (25) and WWOR (6). During the 1990–91 season 51 games were carried—WGN (25), WTBS (21) and WWOR (6). During the 1991–92 season 66 games were telecast—WGN

(30), WTBS (30) and WWOR (6). During the 1992–93 season, 70 games were shown—WTBS (30), WTBS (30) and WWOR (10).

**18.** The numbers of seasonal telecasts discussed below are for regular season games and include the all-star game.

many as 11 games from recent seasons, with an additional 30 game loss if WGN is eliminated.

Further, testimony at trial revealed that although both NBC and Turner wished to negotiate the best deals possible, they entered into the current contracts fully aware that WGN might be allowed to show up to 41 games and the permanent injunction provided for at least 25. No concessions were demanded, and no alterations in contract price, number of games telecast, or promotional activities conducted were negotiated. Tr. 1698–99, 1802–05 (Ebersol); 3823–24, 3886–87 (Stern). As in *NBA I,* it is clear that NBC and Turner were not so worried about superstation telecasts as to decrease either the price they will pay or the games they will show in the event that WGN is allowed to continue broadcasting Bulls games. Furthermore, as NBA witnesses testified, it is evident that beyond serving the purposes of this litigation, even the NBA cares little about WGN's current level of telecasts and agreed voluntarily to increase it from 25 to 30. Tr. 6224, 6134 (Fisher). Since this court's 1991 injunction setting the number of superstation games at 25, the NBA has allowed both WGN and WTBS to televise 30 games in each of the three seasons up until the current one. PTX 753.

The last three years have been instructive in other ways as well. Despite the telecasting of an average of over 65 superstation games a year, the NBA still has provided no empirical evidence to show that national televising of superstation games has been in any way harmful to the league. Significantly absent at trial was any factual evidence indicating an adverse impact on the ability of any of the teams to attract spectators or to promote and broadcast their own games. Tr. 5960–61 (Colangelo); 4153–56 (Lyons). Instead, it was revealed that superstation coverage of the Bulls and Hawks may actually have helped to promote a greater public interest in NBA basketball and substantially increased consumer demand for the NBA products. Tr. 3741–42 (Stern); 6280–82 (Fisher); 6052–53 (Adkins). Moreover, as various owners testified, the promotional efforts of individual teams have increased, not

decreased, in recent years, which may be attributable, at least in part, to the greater exposure, competition and interest created by superstation telecasts. Tr. 4107–08 (Lyons); 6052–53 (Adkins); 5968–70 (Colangelo).

Finally, the NBA attempts to justify the restrictions by arguing that the teams' agreement not to compete in the national market increases the league's efficiency in producing basketball, prevents "chaos" from developing within the league, and insures a competitive balance among teams. If by efficiency the league means the same or even greater profits at less cost, we recognize that this may be the result, but reiterate that "Congress designed the Sherman Act as a 'consumer welfare prescription,'" *NCAA,* 468 U.S. at 108, 104 S.Ct. at 2963 (citation omitted), not as a device to allow competitors to increase their revenues. Moreover, as discussed above, the concrete evidence presented contradicts the conclusion that the current level of superstation broadcasts has negatively impacted the league in any way, much less caused chaos. These telecasts have not reduced the revenues that the NBA or other teams received from the national, regional and local distribution of their products, and under the new NBC and Turner contracts, with their profit-sharing provisions, the NBA may well enjoy substantial increases in national television revenues. The NBA and the teams have never been more successful.

Likewise, there is no evidence that superstation telecasts have led to financial instability within the league or resulted in a greater competitive disparity among the teams. More importantly, however, the restraint on WGN will not significantly enhance the goal of creating a competitive balance within the league, and is certainly not the most effective, nor the least restrictive, method for reaching that goal. As the league has pointed out, it has other mechanisms which are designed to enhance, and in our opinion more directly promote, the competitive balance. These include team salary caps, revenue sharing, and the college draft, in which the weaker teams get to pick the better college players first.

In short, the NBA has produced no evidence that the teams' agreement to reduce or, in the case of WGN, eliminate distribution of their product on the national market will be procompetitive. The most any NBA witness would say is that, while there is no current problem, there may be a time in the future when the national market for NBA games will be saturated and the market value of individual games may be adversely affected. That is not, under the antitrust laws, a valid justification for a conspiracy to restrain output. In any event, given the fact that there are only three superstations, WTBS, WGN and WWOR, and that the latter is not carrying any NBA games, and the former is carrying only 25 league games instead of 30 Hawks games, it does not appear that 41 or less Bulls games on WGN will constitute any saturation threat.

We conclude that the NBA's attempt to prevent WGN and the Bulls from televising any games is a naked restraint on output which will reduce the product available to consumers and is not procompetitive. It therefore violates Section 1 of the Sherman Act as did the earlier attempt to reduce the number of games from 25 to 20.

## V.

## ELIMINATION OF ALL BULLS GAMES ON WGN AND ANTITRUST INJURY

The first subject discussed in the court of appeals opinion is antitrust injury. As the opinion points out, the NBA originally argued that the Bulls and WGN had not established antitrust injury from the loss of 5 games. We analyzed that contention, *NBA I*, 754 F.Supp. at 1352–55, and concluded that they had. The NBA dropped the issue of injury on appeal and has not asserted it here.

If the loss of 5 games constituted antitrust injury, then the loss of 25 or more games, as the NBA now seeks to accomplish, must certainly also be such an injury. Since the NBA has not raised the question, we assume it agrees.

During its discussion of antitrust injury, the court of appeals speculated on who the consumers of TV programs are, the viewers or the advertisers, and assumed "that this subject will be explored further in the proceedings yet to come." *NBA IA*, 961 F.2d at 670. Notwithstanding this assumption, the parties made no effort to explore the subject further.

We have considered it briefly and have concluded that, if it is relevant to the issues here involved, the consumers are the viewers since they consume the product and not the advertisers who simply use TV as one of many media in their efforts to persuade consumers to buy and use their products. We see no reason to conclude that advertisers are any more consumers of TV than they are of newspapers, magazines, radio broadcasts and other means of communication which they employ to sell their merchandise. Or that distributors who deliver products to consumers are themselves consumers of the products they deliver. Advertisers and distributors alike are part of the process of making products move from manufacturer to consumer.

Having analyzed the question of antitrust injury in our earlier opinion and no question with respect thereto having been raised by the NBA, we conclude that no reanalysis is necessary or appropriate, and that there is no question of antitrust injury not being involved in the NBA's efforts to prevent any distribution of its product by the Bulls and WGN.

## VI.

## THE SUPERSTATION BAN

It is res ipsa loquitur that a total ban on superstation telecasts of NBA games would be a naked restraint. The NBA points out, however, that its contract with NBC permits up to 85 games to be televised on cable networks or superstations and that it has contracted with superstation WTBS to carry 25 games. It insists, therefore, that the ban on individual teams contracting with superstations is not an unreasonable restraint.

The only difficulties with the NBA's contention are that (1) the NBA could not, if it chose to do so, contract with WGN to distribute Bulls games since the Bulls have already done that (2) the NBA, even if it could do so,

could not under its contract with NBC agree to contract for distribution of more than 15 regular season games in addition to the 70 it has already sold to TNT and WTBS, (3) the NBA has made it clear that it is not interested in having any Bulls games televised over WGN but seeks to prevent any individual team from contracting for nationwide televising of its games, and (4) that objective is precisely what the Supreme Court held, absent "some competitive justification," another association of sports teams, the NCAA, could not do without violating the antitrust laws. *NCAA,* supra, 468 U.S. at 111, 104 S.Ct. at 2965.

As a result of that holding, individual NCAA teams are free to enter into contracts directly with television over-the-air and cable networks as the University of Notre Dame has done with NBC.

We conclude that, given the NBA's failure to demonstrate any procompetitive or proconsumer benefits, the superstation ban is in violation of the antitrust laws in its application to the transmission of Bulls games on WGN.

## CONCLUSIONS AS TO THE NBA'S CONTENTIONS

As indicated at the outset, we have first considered the NBA's contentions as to why the antitrust laws are not now applicable to their efforts to prevent any member team from contracting for superstation distribution of some or all of its home games. We have examined the NBA contentions and reached the following conclusions, the reasons for which are more fully spelled out earlier in the sections discussing them:

1. *The NBA is a single economic entity and is exempt from the antitrust laws under Copperweld, supra.*

We conclude that the NBA is not a single economic enterprise but is a joint venture of competing and substantially independent teams capable of colluding in violation of § 1 of the Sherman Act.

2. *The formal transfer of the member teams' copyrights to the NBA gives it the right to license or not license whom it chooses and its decision not to license the Bulls and WGN is beyond antitrust challenge.*

We conclude that the transfer of the copyrights is more form than substance since the NBA immediately authorized all the teams to contract for the sale of copyrighted products including TV and radio broadcasts just as they had in the past with no payment of any royalty to the NBA, the ostensible owner of the copyrights. In addition, we conclude that the NBA's use of the teams' copyrights to reduce the number of league games which may be distributed nationally is a restraint that is not immune from the antitrust laws simply because it involves the exercise of copyright privileges. We also conclude that the NBA has not established any justification for its attempt to use the copyrights to restrain distribution of its product.

3. *The transfer by the NBA to NBC of all television rights to NBA games entitles the NBA under the Sports Broadcasting Act to an exemption from the antitrust laws.*

We conclude that, while the NBA ostensibly transferred all television rights to NBC, since the latter was only interested in 25 or 26 regular season games and therefore immediately retransferred all of the remaining 1081 or more regular season games back to the NBA with the understanding that up to 85 of those games could be sold to national cable networks or superstations and the rest to local and regional over-the-air or cable television distributors, the purported NBA-NBC transfer does not make the SBA applicable. In addition, we conclude that Section 1292 of the Act is applicable to the NBA-NBC contract and, accordingly, the contract is excluded from Sports Broadcasting Act protection.

4. *Examination of the proposed restraint under a full rule of reason analysis will establish that it is not an unreasonable restraint.*

We concluded in *NBA I* that the reduction from 25 to 20 games was a naked restraint

and warranted a "quick look" analysis under the antitrust laws. We conclude now that the proposed elimination of 30 or more games is also a naked restraint and that the NBA has produced little evidence that the reduction in distribution of NBA games is or will be procompetitive or pro-consumer.

5. *Antitrust Injury.*

We conclude, and the NBA apparently agrees, that the elimination of all telecasts of Bulls games on WGN will cause antitrust injury.

6. *The Superstation Ban.*

We conclude that the NBA's prohibition of any teams' contracting with a superstation for the distribution of its games, a prohibition which, as a practical matter, is applicable only to the Bulls and WGN is a naked restraint unjustified by any evidence of procompetitive or pro-consumer benefit.

Examination of the various steps taken by the NBA leads to the inevitable conclusion that they are more cosmetic than substantive and that they have but one objective, to prevent the Bulls and superstation WGN from distributing any NBA games over the latter's network. Except for that, the NBA television distribution pattern is virtually identical with what it was at the time of *NBA I.* The local teams have exactly the same rights to sell local and regional telecasts of their games and other copyrighted products. Cable network TNT and superstation WTBS have substantially the same rights as they did previously except that they will carry fewer games and WTBS will telecast a variety of NBA games instead of just those involving the Atlanta Hawks. NBC has the same exclusive right to 25 or 26 regular season games that it had previously. As the French say, the more things change, the more they stay the same.

The attempt to reduce the number of Bulls games on WGN from 25 to 20 which was the subject of *NBA I* has become an attempt to eliminate all Bulls games on WGN. In *NBA I* we found the reduction to be an unjustified naked restraint in violation of Section 1 of the Sherman Act. Our ultimate overall conclusion here is that the NBA teams' efforts to

eliminate all distribution of Bulls' games on WGN is likewise a naked restraint of output unjustified by any procompetitive or pro-consumer considerations and is, therefore, a violation of § 1 of the Sherman Act.

## THE PLAINTIFFS' CONTENTIONS

We turn now to the issues raised by the plaintiffs and the ultimate question of the appropriate relief. The first issue raised by plaintiffs is the validity of the so-called Superstation Blackout.

### A. *The Superstation Blackout*

■ Apparently, in an effort to limit the number of games which can be distributed nationally, as well as to enhance the value of cable television games and reduce the value of WGN's games, the NBA teams adopted a resolution prohibiting any team from televising its games on a superstation on the same night that any game is being shown on any national cable network. This prohibition applies only to superstations, and, as a practical matter, only to WGN. Teams may televise over-the-air or on cable in their local and regional areas not only on the same night, but at the same time, and even the same game as TNT or WTBS. Further, the Turner cable and superstation telecasts are blacked out within 35 miles of the home team's arena.

This is a substantially different restriction from that agreed to in the NBC contract which prohibits teams from televising any game at the same time as NBC, customarily Sunday afternoon, or the same game on a delayed basis. That restriction restraints little output since it involves only 25 or 26 of the 1107 or more regular season games, comparatively few games are scheduled for Sunday afternoons, and no team can appear on NBC in more than seven of its 82 games. Moreover, NBC over-the-air national coverage reaches substantially more consumers than either TNT, WTBS or WGN.

A prohibition against a superstation televising the same game at the same time as a cable network might be logical since in all probability it would not make economic sense to have two simultaneous national television

broadcasts of the same game. The superstation blackout in its present form, however, may well limit and restrain the number of Bulls games WGN will be able to distribute. Since TNT and WTBS will both apparently be protected, although only TNT was in the past, the number of games which will have priority over any Bulls game telecast on WGN increases from 51 to 70 and will eliminate an additional night of most weeks, Thursday. As a result, WGN will be effectively prohibited from showing Bulls games on Tuesday, Thursday and Friday nights as well as on Sunday afternoons. During the past four years, WGN has telecast 19 of the 24 Bulls Thursday night home games.

It is, however, theoretically possible to assemble a schedule of attractive Bulls games for distribution by WGN notwithstanding the same night superstation blackout. This of course depends upon how many Bulls games WGN televises and what games TNT and WTBS select. The difficulty comes in timing since schedules have to be prepared well in advance.

To the extent that the NBA–Turner agreement may prevent the distribution of games on WGN which would otherwise be shown, it may constitute a restraint on output. The NBA made no significant effort at trial to establish that the superstation blackout was procompetitive. The only question we face then is to what extent it is a restraint. The Bulls and WGN introduced evidence indicating that it might be but is not necessarily a restraint on their output. Absent evidence establishing that it is and will be such a restraint, we cannot find that it is. We assume that the parties will either adjust their schedules to avoid any restraint or the Bulls and WGN will be able to establish an actual restraint.

### B. *The Superstation Fee*

■ In *NBA IA,* the court of appeals found that the only procompetitive justification deserving serious analysis was the NBA's argument that its limit on superstation broadcasts was necessary in order to control free-riding. The court noted that free-riding exists when one benefits at no cost from what another has paid for, thereby reducing that investors return and subsequent incentive to invest. It suggested that the Bulls and WGN may have been free-riding by, among other things, reaping the benefits of promotional efforts on NBC and TNT paid for by the league, at no cost to themselves, and intimated that this could be corrected by charging the teams for the right to telecast games on superstations. At the same time, the court recognized that a superstation fee imposed by the NBA would place the league in a paradoxical situation:

> [I]f the League may levy a tax on superstation broadcasts, then there is no free-riding. And if the league may not levy a tax, then a direct limit with the same effect as a tax is unjustifiable. Either way the NBA comes up short, and under *NCAA* the failure of its justifications eliminates the need for the district judge to define a market.

*NBA IA,* 961 F.2d at 676. Notably, the court of appeals did not decide whether a superstation tax or fee was or was not violative of the antitrust laws.

However, in response to the court of appeals suggestion that a fee might be an appropriate response to the alleged free-riding, on April 27, 1993, the member teams agreed that the league would assess a fee for team-licensed national telecasts. The League's decision to adopt a fee reflects "the fundamental premise that the benefits derived from the national distribution of NBA basketball games are to be shared equally by all members of the League and are not to be arrogated by any one individual team." JX 110 at 26.

According to the NBA, the superstation fee formula was developed to reflect the fair market value of superstation telecasts in the national market. The proposed fee begins with a calculation of the per-game price paid for the license for regular season game telecasts sold to the league's national cable carrier, Turner Broadcasting. This per-game price is then adjusted to reflect differences in "reach" and ratings between the League's national carrier and the individual team's national carrier. Thus, in the case of WGN telecasts, the market value is first adjusted downward to account for WGN having a

smaller national universe than Turner. It is then further adjusted on the basis of ratings to account for any difference in the relative attractiveness of Turner's package of games and WGN's, which might be caused by the fact that WGN must select its games after NBC and Turner among other factors. The fee formula also deducts the number of television households in the local market and additional cable households. Finally, the fee formula provides a dollar-for-dollar credit for all payments received by the NBA from the Copyright Royalty Tribunal allocable to the carriage of NBA games by a particular superstation.

Based on the latest date available, the fee formula is projected to yield a payment of approximately .3 cents per household reached by WGN in the market outside Chicago, or approximately $114,000 per game. Turner has agreed to pay .8 cents per household ($469,000 per regular season game) and SportsChannel Chicago has paid 1.75 cents per household. Thus, the NBA claims that the superstation fee does not exceed the market value of televising an NBA game in the national cable television market.

The NBA argues that the superstation fee does not violate the antitrust laws, and in support cites *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 791 F.2d 1356 (9th Cir.1986), *cert. denied,* 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987) ("*Raiders II*"). In *Raiders II,* the court reduced the damage award by an amount equal to the value of an opportunity that the plaintiff took from the League—the opportunity to sell a second franchise in the Los Angeles area. Critical to the court's holding was its conclusion in *Raiders II,* where it had noted that several less onerous forms of territorial restrictions could pass muster under the rule of reason. Based on this holding, the court in *Raiders II* stated, "If such restrictions, applied in a non-arbitrary manner, would be reasonable under the Sherman Act, then a fortiori, a rule requiring merely an objectively-determined payment to league members as compensation for the right to take a valuable, jointly owned franchise opportunity out of the league's hands

would also be a reasonable restriction." 791 F.2d at 1373.

The NBA argues that the rationale underlying *Raiders II* is the avoidance of a free ride because the dispute involved the attempt by one team to take for itself a valuable opportunity that was created by and belonged to the league as a whole. The NBA urges us to find that the fee is lawful because it would require the Bulls to pay no more than the fair market value of the superstation broadcasts.

The plaintiffs argue that *Raiders II* is not applicable because "*Raiders II* held only that the Raiders' antitrust *damages* must be *offset* by the value of the opportunity to expand into Los Angeles," and here the plaintiffs request only injunctive relief. While technically this argument is correct, we do not accept such a narrow reading of *Raiders II,* primarily because we believe that, subject to the antitrust laws, the league is entitled to charge for opportunities which it creates. Accordingly, we now consider the superstation fee in the antitrust context.

Similar to the superstation ban, the superstation fee was established by an agreement among the members of the league, which we have found to be acting as a joint venture. We found that the superstation ban was a horizontal agreement among competitors to reduce output. Likewise, we find that the superstation fee on its face is an agreement to reduce output and fix prices. As a justification for the fee, the NBA claims that it is necessary to control free-riding.

The plaintiffs argue that a group of competitors cannot justify a horizontal agreement to impose a fee on their competitors with a claim that the fee addresses a free-riding problem, citing *Premier Elec. Const. Co. v. N.E.C.A., Inc.,* 814 F.2d 358, 369 (7th Cir.1987). As the NBA notes, *Premier Electrical* is distinguishable because in that case a trade association imposed the fee on nonmembers in order to raise prices. Here, the NBA is imposing the fee on its own members, and the court in *Premier Electrical* did not express a view on the validity of an agreement among members. *See* 814 F.2d at 371 n. 3. However, in declining to express a view, the court did note that an agreement

among members would affect a smaller amount of the industry's output and would not prevent any firm from dropping its membership in order to compete.

Neither of these factors are applicable here. The NBA is currently the sole national league of professional basketball teams. As the alleged sole licensor of all national telecasts, the NBA imposes the superstation fee on the only other possible licensors of games, the member teams themselves. Unlike the situation in *Premier Electrical,* the elements of necessary cooperation between the member teams makes it exceptionally difficult for member teams to drop out in order to compete more effectively. As the court of appeals recognized, many of the cooperative aspects of sports leagues involve practices that are otherwise hallmarks of cartels. The problem here is distinguishing between those aspects necessary for the production of games, and those merely incidental. Here, the member teams cannot play basketball games without the other member teams and a large number of the agreements among the teams are directly related to production of the actual games themselves.

The teams *can* enter into television contracts without the other teams, and as we found above, the antitrust laws apply to agreements which act to reduce output. However, agreements between joint venturers which serve a procompetitive purpose and increase output will survive antitrust scrutiny. *See Broadcast Music, Inc.,* 441 U.S. at 19–24, 99 S.Ct. at 1562–1565.

Here, the NBA claims that the superstation fee is necessary to prevent free riding. Initially, we agree somewhat with the plaintiffs' claim that the inherent problem with the NBA's free-riding argument is that the NBA seeks to determine who is engaged in free riding, what conduct is considered free-riding and what fee is necessary to prevent it. When the NBA, as it did for many years, allowed the teams to enter into contracts with superstations, it was not considered to be free-riding when they did so. However, once the teams decided that individual contracts with superstations were banned, the same conduct that the league once permitted became free-riding overnight.

It is precisely because the group of competitors defines free-riding and is the only group which is in the position to charge a fee to prevent free-riding, that free-riding in the context of horizontal agreements is inherently suspect. As the Seventh Circuit has noted, "[c]ontrol of free-riding is ... an accepted justification for cooperation." *NBA IA,* 961 F.2d at 674. Yet, free-riding typically occurs in vertical chains of distribution, and arrangements to prevent free-riding typically are allowed in the context of vertical arrangements, because market forces naturally operate to limit the extent of any restraints. *See Premier Elec.,* 814 F.2d at 369. As the court stated in *Premier Electrical:*

> This rationale [which allows some vertical restraints in order to prevent free-riding] depends on the alignment of the interests between consumers and manufacturers. Destroy that alignment and you destroy the power of the argument. If the dealers meet and agree on the price they will charge or the territories they will occupy, and then induce the manufacturer to go along, that agreement will be illegal per se. [cites omitted]. It is so here. No one involved in establishing and collecting the ... fee had consumers' interests at heart. No automatic mechanism corrects blunders.... The arrangement covers 100% of the market, so that other forms of organization cannot readily undercut it.

To put the point slightly differently, the "automatic" force that undercuts price-fixing agreements is "cheating". Each seller has an incentive to shave the price a little in order to sell more; to maintain their sales other firms must reduce price too; the cartel desperately wants to halt the price cutting, which if continued will drive all sellers down to the competitive price. From the perspective of the cartel, the price cutting by individual firms is a form of "free riding". The free rider is taking advantage of the supra-competitive price fixed by the agreement; knowing that other firms are charging a monopoly price, it charges a little less and makes a handsome profit. This process spreads and ultimately destroys the cartel. So in price-fixing cases "free riding" is the way the cartel

unravels. A group of firms trying to extract a supra-competitive price therefore hardly can turn around and try to squelch lower prices—as the Association may have done—by branding the lower prices "free riding"!

814 F.2d at 370. Here, the league of teams has proposed a fee which requires each team entering into a superstation contract to pay a certain amount to the league. As a practical matter, it applies only to the Bulls and WGN. Up until now, the Bulls have entered into these contracts independently, and have retained half of the net revenues, with WGN retaining the other half. The league received only the Copyright Royalty Tribunal's distribution. The NBA appears to have adopted the superstation fee at least in part to correct this situation but it could conceivably increase the price and reduce distribution of Bulls telecasts on WGN. This is precisely the type of situation which *Premier Electrical* warns against.

Nevertheless, we recognize the significant amount of league expense that has gone into the development of the league's product and its understandable desire to recoup some of the revenues that the plaintiffs have been receiving. In addition, each contest involves two teams. The Bulls, by entering into agreements for national telecasts of their games without compensating their opponents or the rest of the league are clearly free-riding on the efforts of the opposing teams and the league. Therefore, even without accepting the NBA's argument that curtailing the Bulls free-ride is legitimate because free-riding will cause weaker teams to expend less energy in promoting their games, to the ultimate detriment of the NBA,[19] we accept the NBA's argument that some sort of fee is reasonable and should be upheld. Implicit in this finding is the caveat that any superstation fee may not denigrate the consumers' interests by increasing the cost and decreasing the output of games nationwide.

Because we believe that some sort of superstation fee could pass muster under the antitrust laws, we now turn our attention to the fee proposed in this case. Under the rationale of *Raiders II,* the league could charge a superstation fee, if that fee is an "objectively-determined" amount which would compensate the league for the opportunities that the plaintiffs have taken. The league urges us to adopt its proposed fee, arguing that it accurately reflects the market value of the superstation telecasts, and thus fits the criteria of *Raiders II.*

The most significant problem with the fee developed by the member teams, however, is that it is in their best interests to charge a fee which will increase aggregate payments to the league, and this will not necessarily increase output but may decrease it. In fact, because of the decreasing marginal return on each additional game over a certain number, this is what the plaintiffs argue will result if the proposed fee is adopted. Here, the member teams, already found to have conspired to reduce output, have set a fee which they argue will compensate them for the lost opportunity to show the games. Although the proposed fee may reflect the market value of superstation telecasts, it is impossible at this time to determine whether in fact it does. In addition, because of the plaintiffs' all-or-nothing stance, we have not been presented with a counter-proposal which would allow us more readily to determine a reasonable fee. For this reason, we believe it appropriate to leave it to the parties to negotiate a reasonable fee. In the event that the parties cannot reach a mutually agreeable fee, we will consider the matter further.

Finally, we note that any superstation fee necessarily will decrease the amount of profitability that the Bulls and WGN realize on the games shown. Yet, just as with our analysis of the alleged procompetitive effects of the NBA's restraints, we are not concerned with the plaintiffs' ability to make a profit, but instead we are concerned about the effects of the restraints on the consumers. To the extent that a reasonable fee reduces the Bulls and WGN's profits but

---

**19.** A premise which the evidence indicates may be just the opposite—testimony at trial indicated that the additional games on superstations have increased the league's exposure to the public overall, and weaker teams have actually increased their marketing efforts in an effort to reach viewers.

does not reduce distribution of product while equitably compensating the other teams for their contribution to the production of the product, we see no objection to it.

## CONCLUSION

Having found that (1) the prohibition of any Bulls games on WGN violates Section 1 of the Sherman Act, (2) the NBA teams' attempts to avoid application of the antitrust laws are invalid, (3) the superstation blackout may be invalid and (4) a superstation tax or fee, if set at a level which does not restrain or prohibit distribution, may be valid but should be negotiated by the parties before we are asked to pass on it, we come to the final question of how many games the Bulls and WGN are entitled to be protected in televising. They ask us to find that any limitation or reduction on the 41 games played by the Bulls each regular season would be an unlawful restraint.

First, it is obvious that depending on how many Bulls home games NBC selects and to which the Bulls have agreed it should have exclusivity, the number of games available to be telecast on WGN could be reduced by as many as 8 games although that is unlikely. There clearly will be some inevitable reduction. Second, in its evidence against the league's proposed superstation tax or fee formula, WGN indicated that the per game advertising revenues from Bulls telecasts diminishes after 30 to 35 games are televised.

Finally, there was no evidence presented that the 30 Hawks games on WTBS, and the 30 Bulls games on WGN, had any adverse effect on individual teams' efforts to attract spectators at their games or secure contracts for local and regional televising of their games. Nor was there any indication that these superstation games harmed the league's negotiations with NBC or the Turner broadcast networks. On the other hand, there was evidence that the demand for televised NBA games was not unlimited and, at some future date, might reach a saturation point.

At the present time our final injunction entered in 1991 and providing for 25 games remains in effect. We see no reason to reduce or vacate it. At the same time we note that the NBA voluntarily agreed for three seasons, up to the current one, that the Bulls and WGN could televise 30 Bulls home games. As previously pointed out, there is no evidence that this distribution has had any negative impact on the individual teams or the league. On the contrary, there is evidence that it may well have had a positive effect as evidenced by the expansion in the number of teams and the overall success of both the teams and the league. In any event, it certainly substantially increased the number of consumers who could enjoy the NBA product.

Considering all the evidence in the case, we conclude that a reduction or restraint in the distribution of less than 30 Bulls games by WGN would be unreasonable. Accordingly, we will modify the injunction previously entered to the extent only of changing the number of games from 25 to not less than 30.

## JUDGMENT PURSUANT
## TO RULE 54(b)

For the reasons set forth in this Court's January 6, 1995 Findings of Fact, Conclusions of Law and Opinion:

### IT IS HEREBY ORDERED THAT:

1. Defendant National Basketball Association, its officers, agents, employees, members, attorneys and all persons or entities in active concert or participation with it are permanently enjoined and restrained from enforcing against plaintiffs any resolutions, rules, regulations or other limitations with the effect of preventing or attempting to prevent plaintiff Chicago Professional Sports Limited Partnership from broadcasting thirty (30) games over plaintiff WGN Continental Broadcasting Company in any National Basketball Association season. This Court shall retain jurisdiction to resolve any controversies under and to enforce this injunction.